# FALK ET AL. *v.* BRENNAN, SECRETARY OF LABOR

No. 72–844.   Argued October 11, 1973—Decided December 5, 1973

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which DOUGLAS, WHITE, and MARSHALL, JJ., joined, *post*, p. 202.

*Herbert V. Kelly* argued the cause for petitioners. With him on the brief were *Franklin O. Blechman* and *E. D. David.*

*Andrew L. Frey* argued the cause for respondent. With him on the brief were *Solicitor General Bork* and *Sylvia S. Ellison.**

MR. JUSTICE STEWART delivered the opinion of the Court.

The Secretary of Labor initiated this action against the petitioners, partners in a real estate management company, for an injunction against future violations of various provisions of the Fair Labor Standards Act of 1938, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.*, and for back wages allegedly due to employees affected by past violations of the Act.[1] The petitioners' defense was that they are not "employers"[2] of the employees involved, and that their business is not a single "enterprise" that is subject to the Act's requirements. This latter contention brought together two separate arguments. First, the petitioners contended that their com-

---

*Howard Lichtenstein* and *Marvin Dicker* filed a brief for the Realty Advisory Board on Labor Relations, Inc., as *amicus curiae* urging reversal.

[1] The complaint alleged violations of the minimum wage (29 U. S. C. § 206 (b)), overtime (29 U. S. C. § 207 (a) (2)), and recordkeeping (29 U. S. C. § 211 (c)) provisions of the Act.

[2] Section 3 (d), 29 U. S. C. § 203 (d), states that an " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee."

bined activities do not constitute an "enterprise," as that term is defined in § 3 (r), 29 U. S. C. § 203 (r). Second, the petitioners argued, even if their business activities do amount to an "enterprise," they are not an "[e]nterprise engaged in commerce or in the production of goods for commerce," as that term is defined in § 3 (s), 29 U. S. C. § 203 (s), because they do not have an "annual gross volume of sales made or business done" of $500,000.[3]

Under the partnership name of Drucker & Falk (D & F), the petitioners render management services for the owners of a number of apartment complexes in the State of Virginia. Under its contracts with the apartment owners, D & F agrees to perform, on behalf of each owner and under his nominal supervision, virtually all management functions that are ordinarily required for the proper functioning of an apartment complex.[4] These contracts are for a stated term of not less than one year. Each party can terminate the arrangement by giving the other party 30 days' notice of his intent to do so. Neither D & F nor any of its partners hold any property interest in the buildings that D & F manages. D & F receives as compensation a fixed

---

[3] The dollar-volume limitation was $500,000 at all times relevant to this action. 29 U. S. C. § 203 (s) (1). On February 1, 1969, the dollar-volume limitation was reduced to $250,000.

[4] D & F performs all the functions required for leasing, maintaining, and operating the apartment buildings. These include advertising the availability of apartments for rent; signing, renewing, and canceling leases; collecting rents; instituting, prosecuting, and settling all legal proceedings for eviction, possession of the premises, and unpaid rent; making necessary repairs and alterations; negotiating contracts for essential utilities and other services; purchasing supplies; paying bills; preparing operating budgets for the property owners' review and approval; submitting periodic reports to the owners; and hiring and supervising all employees required for the operation and maintenance of the buildings and grounds.

percentage of the gross rentals collected from each project.[5]

The rentals collected by D & F are deposited in local bank accounts.[6] From these accounts it pays all expenses incurred in operating and maintaining the buildings. After deducting its compensation, as well as any other applicable expenses, D & F transmits payments to the various owners on a periodic basis. If disbursements for any apartment complex exceed its gross rental receipts, the owner is required under the contract to reimburse D & F.

The subject of the Secretary's complaint was the wages and hours of the maintenance personnel who work at each of the apartment complexes, the contention being that D & F is in violation of the minimum wage, overtime, and recordkeeping provisions of the Act with respect to these maintenance workers. These employees work under the supervision of D & F and are paid from the rentals received at the apartment complexes where they are employed. They are considered in the contracts between the owners and D & F as "employees of the project owners."

In the District Court, D & F contended that its management activities at the several apartment complexes do not constitute a single "enterprise," as that term is defined in § 3 (r) of the Act, 29 U. S. C. § 203 (r); that, even if its business is a single "enterprise," it does not have the $500,000 "annual gross volume of sales made or business done" required by § 3 (s)(1), 29 U. S. C. § 203 (s)(1), for coverage by the Act; and that it is not an "employer" of these maintenance workers, as that term

---

[5] The commission that D & F receives varies between 4% and 6%, depending on the particular arrangements with the building owner.

[6] The rents for all the buildings managed by D & F totaled over $7,700,000 in 1967 and over $8,600,000 in 1968.

is defined in § 3 (d), 29 U. S. C. § 203 (d). The District Court agreed with all three of these contentions and dismissed the complaint. The Court of Appeals reversed. It held that the management activities performed by D & F constitute a single "enterprise" for coverage purposes and that D & F meets the statutory definition of "employer" with respect to the maintenance workers. The appellate court also concluded that, in determining whether the enterprise satisifies the dollar-volume limitation, it is the gross rentals that D & F collects at all the apartment complexes that must be considered, rather than, as the District Court had held, the gross commissions that D & F receives from the apartment owners. Since there is no question that these gross rentals exceed $500,000 annually, the court held that D & F is subject to the Act and in violation thereof with respect to the maintenance workers.

We granted certiorari to review this judgment of the Court of Appeals.[7] Two days later, we held, in *Brennan* v. *Arnheim & Neely, Inc.,* 410 U. S. 512 (1973), that a fully integrated real estate management company that directs management operations at several separately owned buildings was a single "enterprise" for purposes of the Act, thus confirming the holding of the Court of Appeals on that issue in the present case. But our decision in *Arnheim & Neely* did not reach the other two statutory questions raised by D & F. We accordingly

---

[7] Both the District Court and the Court of Appeals had this case before them twice. Initially, the District Court dismissed the complaint. The Court of Appeals reversed and remanded for further proceedings. *Shultz* v. *Falk*, 439 F. 2d 340. The petitioners sought certiorari, and we denied the writ. *Falk* v. *Hodgson*, 404 U. S. 827 (1971). On remand to the District Court, the petitioners resisted the imposition of judgment and particularly the awarding of pre-judgment interest. The District Court rendered judgment against the petitioners and awarded prejudgment interest. The Court of Appeals affirmed, and the petitioners again sought certiorari.

limited the grant of certiorari to questions 2 and 3 presented by the petition:

"(2) Under the Fair Labor Standards Act to be covered an enterprise must have an 'annual gross volume of sales made or business done' of $500,000. Is this figure to be measured by the gross rentals collected by the agent or by that agent's gross commissions?

"(3) Are maintenance workers employed at the buildings managed by petitioners employees of the apartment owner or of the petitioners?" 410 U. S. 954.

I

As to question 3, the "employees" issue, it is clear that the maintenance workers are employees of the building owners. But we think that the Court of Appeals was unquestionably correct in holding that D & F is also an "employer" of the maintenance workers under § 3 (d) of the Act, which defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U. S. C. § 203 (d). Section 3 (e) defines "employee" to include "any individual employed by an employer." 29 U. S. C. § 203 (e). In view of the expansiveness of the Act's definition of "employer" and the extent of D & F's managerial responsibilities at each of the buildings, which gave it substantial control of the terms and conditions of the work of these employees, we hold that D & F is, under the statutory definition, an "employer" of the maintenance workers. We turn, therefore, to the other question embraced in the grant of certiorari.

II

In *Brennan* v. *Arnheim & Neely Inc., supra,* we held that the integrated operations of a real estate management company satisfied the definition of "enterprise"

under § 3 (r) of the Act. This holding was based upon the conclusion that the management activities met the three statutory tests of an "enterprise": related activities, unified operation or common control, and common business purpose. It is important to understand, however, that the "enterprise" the Court found in *Arnheim & Neely* consisted of the sale of management services by the respondent. The Court did not hold that the separate property interests of each apartment owner were to be considered part of the management enterprise of Arnheim & Neely. Indeed, § 3 (r) and the legislative history of the 1961 "enterprise amendments" to the Act strongly suggest that the use of common agents by independent entities is not sufficient to convert to a single "enterprise" what otherwise are independent businesses.[8] Thus, D & F's enterprise in the present

---

[8] Section 3 (r), 29 U. S. C. § 203 (r) provides, in pertinent part: "[A] retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement, (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact it occupies premises leased to it by a person who also leases premises to other retail or service establishments."

The Senate Report on the 1961 amendments to the Act included the following statements regarding this portion of § 3 (r):

"[T]he mere fact that a group of independently owned and operated stores join together to combine their purchasing activities or to run combined advertising will not for these reasons mean that their activities are performed through unified operation or common control and they will not for these reasons be considered a part of the same 'enterprise.'" S. Rep. No. 145, 87th Cong., 1st Sess., 42.

case, as in *Arnheim & Neely,* consists of and is limited to its combined management activities at the various apartment complexes.

The Act imposes its requirements, not on every "enterprise," but only on an "enterprise engaged in commerce or in the production of goods for commerce." [9] One of the statutory elements of the latter term is the dollar-volume limitation, which in this case is $500,000 annually.[10] The bone of contention between the Secretary and D & F is whether this dollar-volume limitation is to be measured by the annual gross rentals collected by D & F as agent of the apartment owners, or by the gross commissions paid to D & F by the owners as compensation for its management services. Section 3 (s)(1), which prescribes the dollar-volume limitation, speaks of "an enterprise *whose* annual gross volume of sales made or business done is not less than $500,000." 29 U. S. C. § 203 (s)(1). (Emphasis added.) This statutory language requires that, after determining what the relevant enterprise is, we turn our attention to what *that enterprise* sells or to what business *it* does.

Any doubt about whether the rental of space is a "sale" for purposes of the Act was removed when Congress amended § 3 (s) in 1966 to provide that the dollar-volume limitation would henceforth be measured by "annual gross volume of sales made or *business done,*" 80 Stat. 831 (emphasis added). The Senate Report on the 1966 amendments makes clear that the added language was intended to dispel any uncertainty that revenue derived from services, rentals, or loans, even though perhaps not literally "sales," was nevertheless to be considered in

---

[9] See, *e. g.,* § 6 (b) (29 U. S. C. § 206 (b)), § 7 (a) (29 U. S. C. § 207 (a)), and § 11 (c) (29 U. S. C. § 211 (c)).

[10] The petitioners' gross commissions amounted to slightly more than $434,000 and somewhat less than $463,000 in 1967 and 1968, respectively, the years involved in this litigation.

measuring the dollar-volume limitation of § 3 (s). The Report indicates that the amendment was intended to signify legislative approval of the result in *Wirtz* v. *Savannah Bank & Trust Co.*, 362 F. 2d 857, which so interpreted § 3 (s) as it read before .the addition of the "business done" language. As the Senate Report explained:

> "The annual gross volume of sales made or business done by an enterprise, within the meaning of section 3 (s), will thus continue to include both the gross dollar volume of the sales . . . which it makes, as measured by the price paid by the purchaser for the property or services sold to him . . . , and the gross dollar volume of any other business activity in which the enterprise engages which can be similarly measured on a dollar basis. This would include, for example, such activity by an enterprise as making loans or renting or leasing property of any kind." S. Rep. No. 1487, 89th Cong., 2d Sess., 7–8.

But, a determination that rentals are "sales made or business done" within the meaning of the Act does not begin to dispose of the issue before us. The question remains, under § 3 (s)(1), what enterprise made the sales or did the business.

The Secretary contends that the "sales made or business done" by D & F includes the gross rental income of apartments in the buildings that it manages. He argues that the fact that D & F does not own the buildings should not preclude attribution of the rentals to it. D & F argues that it sells only managerial services and thus that the rentals it collects on behalf of the owners are not "sales made or business done" by its enterprise. It contends, therefore, that its gross sales should be measured, not by the rentals it collects from the tenants, but rather by

the management fees that the owners pay it as compensation for its services—*i. e.*, its gross commissions.

The line between a seller of a product and a seller of a service is not always readily discernible, especially when one of the services relates to the sale of a product or, what amounts to the same thing for purposes of the Act, the rental of space. As an abstract proposition, the Secretary is undoubtedly correct in his position that ownership is not necessarily determinative in attributing "sales made or business done" for purposes of the statute. For example, a consignment seller's gross sales might properly be measured by his gross receipts from sales of the product, even though he did not actually hold title to the product that he sold. Realistically, such a seller is in the business of selling the product that is consigned to him, and he is functionally in a position no different from that of a seller who has purchased the product before resale. The only practical difference may be that the "cost of goods sold" element of the profit equation is expended before resale in the one case and after resale in the other.

In the present case, however, we are convinced that the enterprise of D & F is limited to the sale of its professional management services, and, accordingly, that the commissions it receives are the relevant measure of its gross sales made or business done for purposes of the dollar-volume limitation in § 3 (s)(1). D & F collects a number of rentals on behalf of the property owners. In nearly every case, these rentals are paid pursuant to lease agreements of significant duration. Some may predate D & F's management of the premises, and D & F may thus have had absolutely nothing to do with the "sales" underlying the periodic rentals it collects for the owner.[11]

---

[11] The record does not show what proportion of the rentals is attributable to leases predating D & F's managerial tenure at each

When a lease does expire and is not renewed by the tenant, D & F undertakes to find a new tenant for the owner and serves as agent for the owner in the negotiation and execution of a new lease. With respect to such a lease, a colorable argument can be made for attribution of the rentals to D & F, since its negotiation of a new lease increases, or at least maintains, the volume of rents collected and thus also its percentage compensation. But such an argument does not withstand any but the most superficial analysis.

In the typical commodity sale the seller's remuneration is a function of the gross margin between the cost of the product to him and the resale price. At first blush, the determination of D & F's compensation as a percentage of the gross rentals seems somewhat akin to the margin of the typical seller. Upon reflection, however, a critical difference appears: when a lease is negotiated by D & F, its remuneration is calculated, not from the proceeds derived from that lease, but only from the rentals collected during its managerial tenure, during which period it renders significant and substantial management services beyond its earlier service in negotiating the lease. It is clear, therefore, that the business of the D & F enterprise is not the sale of a product (the rental of realty) but a sale of professional management services. This conclusion follows logically from our holding in *Arnheim & Neely* that the relevant enterprise for purposes of deciding whether a real estate management company is covered by the Act, consists of its "aggregate manage-

---

building. When the underlying lease does predate D & F's contract with the owner, however, the total absence of any participation by D & F in the lease transaction, of which the periodic rentals are merely the proceeds, belies any attempt to attribute these rentals to D & F as an index of its gross "sales made or business done."

ment activities" at the various buildings that it supervises. 410 U. S., at 519. In this regard, the commissions received by D & F differ even from the compensation received by the typical broker of realty or stock, whose primary undertaking is to negotiate a sale of the principal's property and whose compensation is calculated on the proceeds of that sale.

On these facts, we think the conclusion is inescapable that D & F vends only its professional management services, and that the gross rentals it collects as part of these services do not represent sales attributable to its enterprise. It follows that the correct measure of the "gross volume of sales made or business done" by D & F is the gross commissions it receives from the apartment owners as compensation for the management services it renders.[12] Since these commissions did not reach $500,000 annually during the period involved in this litigation, it follows that D & F was not an "[e]nterprise engaged in commerce or in the production of goods for commerce," within the meaning of the Act.

---

[12] Part II of the dissent suggests that the "annual gross volume of sales made or business done" of D & F's enterprise "must include amounts paid by the building owner to cover operation and maintenance costs, plus the amount paid as commissions." *Post*, at 211. The dissent's rationale is that D & F was in effect paying the operation and maintenance costs itself and then being reimbursed by the apartment owners. Such an argument was not made by the Secretary. Even if such a payment and reimbursement arrangement would cause the operation and maintenance costs to be included in measuring "annual gross volume of sales made or business done" (which we do not decide), it is clear that such an arrangement did not exist between D & F and the building owners. The rentals were collected by D & F as the agent for the owners and were placed in bank accounts on their behalf. D & F paid the operation and maintenance costs of the buildings from the owners' funds pursuant to its agreement with, and on the authority of, the owners.

The judgment of the Court of Appeals is vacated and the case is remanded to the District Court for further proceedings consistent with this opinion.[13]

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part.

I concur in the Court's holding that petitioners are "employers" of the maintenance workers who service the apartment buildings managed by D & F.

I dissent, however, from the holding that, for the purposes of § 3 (s)(1), "the enterprise of D & F is limited to the sale of its professional management services," and that those services must be measured by D & F's commissions. The record in this case leaves no doubt whatever that D & F's enterprise activities resulted in both the sale of professional management services *and* rental space. While the Court acknowledges that sales of rental space are "sales made or business done" within the meaning of § 3 (s)(1), *ante,* at 197, it nevertheless decides that rental sales should not be attributed to D & F because, "when a lease is negotiated by D & F, its remuneration is calculated not from the proceeds derived from that lease, but only from the rentals collected during its managerial tenure, during which period it renders

---

[13] A footnote in the Secretary's brief states that, in addition to its management services, D & F also sells insurance and real estate. These operations might bring D & F's "annual gross volume of sales made or business done" to more than $500,000 for the years in question if the insurance, real estate sales, and real estate management operations of D & F's business are "related activities" for enterprise coverage purposes under § 3 (r) of the Act. We leave for the District Court the consideration of the Secretary's contention.

significant and substantial management services beyond its earlier service in negotiating the lease." *Ante,* at 200.

To be sure, D & F's remuneration for renting an apartment may not be subject to precise calculation at the time of the sale: compensation for the sale is derived from D & F's percentage of monthly rent receipts, which includes D & F's compensation for building operation and maintenance; and conceivably the building owner might terminate D & F's management contract before the tenant makes all the monthly payments required under the lease, thus reducing D & F's compensation for the sale of the rental space. It is also true that after selling the rental space, D & F performs other significant and substantial management services. But these rather unsurprising observations hardly supply a basis for the Court's conclusion that: "It is clear, therefore, that the business of the D & F enterprise is not the sale of a product (the rental of realty) but a sale of professional management services," and that such services must be measured by commissions. Neither the facts in this case, nor the plain words of § 3 (s)(1), and the uncommonly unambiguous legislative history of that section support the Court's conclusion that Congress meant to measure one particular enterprise activity to the exclusion of others.

I

Section 3 (s)(1) limits coverage under the Act to those enterprises "whose annual gross volume of sales made or business done is not less than $500,000 ...." [1]   29 U. S. C.

[1] Section 3 (r) of the Act, 29 U. S. C. § 203 (r), defines "enterprise" to mean:

"the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment

§ 203 (s)(1). The term "sales" employed in § 3 (s)(1) is defined with specificity in § 3 (k) of the Act, 29 U. S. C. § 203 (k), to mean *"any* sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition" (emphasis added). Those are simple and entirely unambiguous words that do not even remotely imply that only *some* "sales made or business done" should be measured. Clearly, § 3 (s)(1), in terms, embraces the gross volume of apartment leases sold by D & F, as well as the professional management services sold by D & F to building owners.[2]

In addition, even were the wording of § 3 (s)(1) less clear, "[t]his is not a case where perforce we must attempt to resolve a controversy as to the true meaning of equivocal statutory language unaided by any reliable extrinsic guide to legislative intention," *Mitchell* v. *Kentucky Finance Co.,* 359 U. S. 290, 293 (1959). Senate and House Reports concerning the 1961 and 1966 "enterprise amendments" to the Act show explicitly that Congress

operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor . . . ."

The dollar-volume test of § 3 (s)(1) of the Act, 29 U. S. C. § 203 (s)(1), limits coverage during the period February 1, 1967, through January 31, 1969, to those enterprises "whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated) . . . ." On February 1, 1969, the dollar-volume test was reduced to $250,000. It is not disputed that each year since February 1, 1969, petitioners have met the dollar-volume requirement of the Act.

[2] In addition to the Court of Appeals below, the Courts of Appeals for the Fifth and Tenth Circuits have held that the leasing of rental property constitutes a "sale" within the meaning of the enterprise provisions of the Act. See *Wirtz* v. *Savannah Bank & Trust Co.,* 362 F. 2d 857 (CA5 1966); *Wirtz* v. *First National Bank & Trust Co.,* 365 F. 2d 641 (CA10 1966).

intended enterprise activities to be measured by *all* "sales made or business done." [3]

Prior to 1961, the protections of the Act were extended only to employees who were themselves "engaged in commerce or in the production of goods for commerce," §§ 6 (a), 7 (a), 29 U. S. C. §§ 206 (a), 207 (a). With the enterprise amendments of 1961, Congress substantially broadened the coverage of the Act to include all employees "employed in an enterprise engaged in commerce," 75 Stat. 67, 69. But not every enterprise meeting the statutory definition in § 3 (r) of the Act was brought within the Act's coverage. Section 3 (s)(1) prescribed a dollar-volume test that limited the Act's coverage to those enterprises that had an "annual gross volume of sales of . . . not less than $1,000,000," *id.*, at 66. The Senate and House Reports show that the dollar-volume test was adopted to establish an economic standard that predicates coverage of the Act upon the size of the enterprise and its impact upon commerce. See H. R. Rep. No. 75, 87th Cong., 1st Sess., 3, 7, 13 (1961); S. Rep. No. 145, 87th Cong., 1st Sess., 6–7, 31 (1961); see also the Staff Report of Labor Subcommittee offered on the floor by Senator McNamara, 107 Cong. Rec. 5840–5842 (1961).

To insure that the term "sales" would not be given a narrow or technical interpretation that might exclude some enterprises that have the requisite dollar volume

---

[3] A continuance of the judicial practice of liberal interpretation of the Act was clearly contemplated by Congress:

"In keeping with the broad statutory definitions of the coverage phrases used, the courts have repeatedly expressed and adhered to the principle that the coverage phrases should receive a liberal interpretation, consonant with the definitions, with the purpose of the Act, and with its character as remedial and humanitarian legislation." H. R. Rep. No. 1366, 89th Cong., 2d Sess., 10 (accompanying the 1966 amendments to the Act).

of business, but that do not make typical commodity sales,[4] Congress amended the enterprise provisions of the Act in 1966, 80 Stat. 831, by substituting the wording "annual gross volume of sales made *or business done*" (emphasis added), for "annual gross volume of sales," the term employed in the 1961 amendments. The Senate Report fully explains Congress' reasons for changing the terminology:

> "This test . . . is intended to *measure the size of an enterprise* for purposes of enterprise coverage *in terms* of the annual gross volume in dollars (exclusive of specified taxes) *of the business transactions which result from activities of the enterprise,* regardless of whether such transactions are 'sales' in a technical sense.
>
> ". . . The addition of the term 'business done' to the statutory language should make this intent abundantly plain for the future and remove any possible reason for misapprehension. The annual gross volume of sales made or business done by an enterprise, within the meaning of section 3 (s), will thus continue [under the 1966 Amendments] to include both the gross dollar volume of the sales (as defined in sec. 3 (k)) which it makes, as measured by the price paid by the purchaser for the property or services sold to him (exclusive of any excise taxes at the retail level which are separately stated), and the gross dollar volume of any other

---

[4] Questions concerning the scope of the term "sales" in the dollar-volume provision of the 1961 enterprise amendments had arisen in suits brought by the Secretary of Labor to enforce the Act. For example, in *Wirtz* v. *Savannah Bank & Trust Co., supra,* the defendant bank contended "that the term 'sales' must be given a 'literal interpretation' and . . . would not include rental receipts, interest on loans and securities or income from services." 362 F. 2d, at 862–863 (footnote omitted).

business activity in which the enterprise engages which can be similarly measured on a dollar basis. *This would include,* for example, *such activity by an enterprise as* making loans or *renting or leasing property of any kind.* S. Rep. No. 1487, 89th Cong., 2d Sess., 7–8 (1966). (Emphasis added.)

Congressional intent, with respect to the dollar-volume test in § 3 (s)(1), could not be more clear: "the business transactions which result from activities of the enterprise" are to be measured. No transactions are excepted from measurement. Nothing in the legislative history suggests that when remuneration for essentially different transactions is in some way commingled, or when an enterprise engages in closely related activities, only those transactions constituting the essence of enterprise should be measured. For the purposes of § 3 (s)(1), the only relevant inquiry is what activities the enterprise engages in, and what sales or business transactions result from those activities. Measurement of the dollar volume of those transactions indicates the size of the enterprise and its impact upon commerce.

Turning to the facts in this case, it is clear from the stipulated record in the District Court that D & F engages in essentially two distinct, though related, activities. First, D & F rents apartments to the public. In this connection, D & F employs a staff of sales personnel who advertise available apartments, interview prospective tenants, and negotiate and renew leases on behalf of the apartment-building owner. Second, D & F operates and maintains apartment buildings. By contract with the building owner, D & F agrees to collect rent; initiate, prosecute, and settle all legal proceedings for eviction, possession of the premises, and unpaid rent; make repairs and alterations; negotiate contracts for utilities and other necessary services; purchase supplies;

pay all bills, including mortgage payments; prepare an operating budget for the building owner's review and approval; submit periodic reports to the owner; and hire, discharge, and supervise all labor and employees required for the operation and maintenance of the premises. Thus, D & F performs both brokerage and management activities. Indeed, the first article of every contract entered into by D & F and a building owner states: "Owners hereby employ and appoint [D & F] as the sole and exclusive *renting and management agent . . ."* (emphasis added).

The business transactions resulting from these activities are quite distinct and subject to separate measurement. D & F's *brokerage* activities result in the sale of rental space to the public. D & F's *management* activities result in a business transaction between D & F and the building owner, *i. e.,* D & F's sale of professional management services.

The Court, however, focuses upon D & F's management activities and measures only the resulting transaction between D & F and the building owners. To be sure, these transactions have an impact upon commerce and must, therefore, be measured under the dollar-volume test. As a result of these transactions, D & F hires and supervises more than 100 persons who perform all the functions necessary for the efficient operation and maintenance of apartment buildings, and thus engages in activities which clearly induce a flow of men, money, and materials across state lines. But, as significant as this impact upon commerce may be, it pales by comparison to the impact caused by D & F's brokerage activities. To sell apartments, D & F employs a special staff of personnel whose duties include developing marketing strategies, placing advertisements in various media, interviewing prospective tenants, and negotiating

leases. These activities generate a flow of millions of dollars per year in gross rent receipts, with consequent impacts upon commerce too numerous and obvious to trace here. The significant impact of D & F's brokerage activities upon commerce is not diminished by the fact that the apartment buildings are owned by others. It is D & F's brokerage activities—not the building owners'—that result in the sale of rental space. In this respect, D & F, as a broker selling rental space owned by others, is indistinguishable from the salesman of consignment goods, whose "sales made or business done," the Court concedes, *ante*, at 199, must be measured by the gross receipts from sales of the product.

Ignoring D & F's brokerage activities and their resulting transactions, therefore, not only contradicts Congress' clearly expressed intention that transactions resulting from *any* activity of the enterprise be measured, but also undermines the effectiveness of the dollar-volume test as a measure of an enterprise's size and impact upon commerce.[5] "Where both the words of a statute and its legislative history clearly indicate the purpose of Congress, it should be respected," *Schwegmann*

---

[5] An enterprise's dollar volume of "sales made or business done" is measured by its "gross receipts," see part II, *infra*. The record indicates that D & F collected gross rent receipts of $7,752,600.86 in 1967 and $8,607,086.04 in 1968. That portion of the gross rent receipts attributable to D & F's sales of rental space constitutes the proper dollar-volume measure of D & F's brokerage activities. As discussed in part II, *infra*, D & F's "gross receipts" for its management activities must be measured by the commissions D & F receives for such services plus any reimbursements D & F receives for the cost of men and materials. Since D & F is paid a single commission for both its brokerage and management activities, that portion representing compensation for its sale of rental space must be subtracted from the total commission in order accurately to measure that portion of the commission attributable to its professional management services.

*Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 402 (1951) (Frankfurter, J., dissenting).

## II

Even proceeding on the Court's erroneous basic premise, however, D & F's sales of professional management services exceed $500,000 when computed, as Congress required, under the specific regulations promulgated by the Wage and Hour Division of the Department of Labor to effectuate § 3 (s)(1).[6] As a guide to making computations under § 3 (s)(1), Congress instructed that:

"The method of calculating the requisite dollar volume of sales or business [for enterprise coverage purposes] will be the same as is now followed under the law with respect to calculating the annual dollar volume of sales in retail and service establishments, and in laundries under the exemptions provided in section 13 (a)(2), (3), (4), and (13) of the act. The procedure for making the calculation is set forth in the Department's Interpretative Bulletin [pertaining to retailers of goods and services]. As it is there stated, the 'annual dollar volume of sales' consists of the *gross receipts from all types of sales* during a 12-month period." S. Rep. No. 145, 87th Cong., 1st Sess., 38 (1961). (Emphasis added.)

This "gross receipts" method of computation is presently embodied in regulations which state: "The annual gross dollar volume of sales made or business done of an enterprise or establishment consists of the *gross receipts from all of its sales or its volume of business done* during a 12-

---

[6] Section 602 of Pub. L. 89–601, 80 Stat. 844, provides that the Secretary of Labor is "authorized to promulgate necessary rules, regulations, or orders with regard to the [1966 enterprise] amendments made by this Act."

month period," 29 CFR § 779.265. (Emphasis added.) See also 29 CFR §§ 779.259, 779.266–779.269.

Gross receipts from "sales" of professional services are not necessarily limited to commissions. True, if the "sale" is only of the personal labor of the seller, commissions may well be the sole measure of "sales made or business done" because commissions are the seller's only gross receipts. And where, in addition to his own labor, the seller of professional services provides, for a commission, personnel and materials as an integral part of the professional services rendered, the commission still constitutes the gross receipts for the sale of services. If, on the other hand, the purchaser of the professional services reimburses the seller for the costs of men and material and also pays a commission, plainly "gross receipts" under the statute and regulation are the reimbursement plus the commission.

D & F was compensated for its professional management services on a cost-plus-commission basis. It employed maintenance workers and purchased materials necessary for the operation and maintenance of the apartment buildings. By contract, the building owner agreed to reimburse D & F for these operation and maintenance costs,[7] and, in addition, to pay D & F a commission.[8] Thus, D & F's gross receipts must include amounts paid by the building owner to cover operation and maintenance costs, plus the amount paid as commissions.

---

[7] The apartment building owners never actually sent funds to D & F to cover its costs and commissions. Rather, these sums were deducted by D & F from the total receipts it collected from the tenants of each apartment building.

[8] D & F's commissions are either 4% or 6% of gross rent receipts, depending upon the extent of the services it agrees to render.