Elizabeth DOLE, Secretary of Labor, United States Department of Labor, (Successor to Ann McLaughlin), Plaintiff,

v.

Jack B. SIMPSON, Defendant.

No. IP 88–66C.

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 25, 1991.

Phyllis B. Dolinko, U.S. Dept. of Labor, Office of Sol., Chicago, Ill., for plaintiff.

Robert M. Koeller, Indianapolis, Ind., for defendant.

## ENTRY DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (FILED AS AN AMENDED MOTION TO DISMISS)

TINDER, District Judge.

The Secretary of Labor alleges that Defendant Jack B. Simpson failed to pay his employees minimum wages and overtime pay required by the Fair Labor Standards Act (the "Act" or "FLSA"). Responding that he is not the proper party liable for such a violation, the Defendant filed a Motion to Dismiss the claim. The sole issue raised here is whether the Defendant had the status of an "employer" under the Act when the alleged violations occurred.

For the reasons discussed below, the Court considers Defendant's motion a Motion for Summary Judgment on the issue whether the Defendant was an "employer." Finding genuine questions of material fact regarding the extent of Simpson's actions in the interest of the corporation in relation to the employees, the Court will deny Defendant's Motion for Summary Judgment.

## I. BACKGROUND[1]

Alpha Systems Resources, Inc. ("Alpha") was incorporated in the State of Delaware on February 14, 1984. Alpha's corporate offices were located in Indianapolis, Indiana and its principal place of business was in Shelbyville, Indiana. The corporation originally provided two services; Alpha gathered information to package and sell to credit reporting agencies and it operated a student placement service. A.S. Roberts ("Roberts") was the initial Chairman of the Board and Chief Executive Officer ("CEO"). Four original shareholders held a total of 750,000 shares.

In need of additional financing, the corporation contacted venture capitalist Jack

---

1. The factual information provided here is derived from the parties' briefs and submissions. The deponents were Jack B. Simpson, Dennis L. Gershowitz, Ronald J. Buth, Richard H. Wilcox and A.S. Roberts, Jr. The facts stated are not disputed, unless so noted.

B. Simpson ("Simpson") at his home in Florida. Alpha sold Simpson a limited partnership interest for $25,000. Simpson believed that private placements were a poor investment strategy; he offered to finance Alpha personally, search for additional investors and obtain professional management. Simpson envisioned a vast expansion of Alpha's services and thought it could generate sales of 100 million dollars per year.[2] Beginning in the Fall of 1984, Simpson provided significant financial consulting services to Alpha and entered into a formal agreement for these services on January 1, 1985. Under Simpson's guidance, Alpha attempted to expand from regional to international scale and offer numerous additional services.

To meet these objectives, Alpha needed substantial capital. Simpson's primary responsibility at this stage was to raise these funds. On December 1, 1984, Simpson received 996,000 shares of stock in lieu of a salary for his consulting services. By March, 1985, Simpson became the controlling shareholder of Alpha, with 2,650,000 of Alpha's 4,000,000 shares. At a meeting of the Alpha Board of Directors, held March 23, 1985, Simpson was elected President of Alpha and a member of the Board of Directors. Simpson claims that this was a figurehead position only and that he was never involved with the day-to-day operations of the company. (Simpson Dep. at 25.) Other evidence indicates that Simpson was elected President because he was the de facto leader of Alpha. Simpson agrees that his involvement in the corporation increased as its financial position became worse in late 1985. (*Id.* at 32.)

Soon after being elected President, Simpson took charge of hiring the corporation's "high paid executives"; almost all of the upper-level managers and their immediate subordinates were hired by him. By May 31, 1985, Bruce Whitman ("Whitman"), James L. Thompson ("Thompson") and Simpson's stockbroker, Frank Mauro, occupied three of the eight Alpha board positions. Whitman represented Simpson

in the day-to-day operations and Thompson was hired by Simpson as Alpha's Chief Financial Officer. By mid-summer 1985, Thompson by-passed Indiana-based management and reported directly to and took instructions directly from Simpson. Simpson told Roberts that Simpson would take care of the financial side of the corporation.

Ronald J. Buth ("Buth") joined Alpha as a special advisor to Simpson in August 1985; Buth worked on projects assigned by Simpson. In October, 1985, Buth replaced Roberts as CEO of Alpha at an unofficial meeting of officers and directors held in Atlanta. This was the last Board of Directors' meeting, official or unofficial, until January 1986. As CEO, Buth reported to Simpson directly and executed his orders.

In November 1985, Alpha was desperate for additional funds. By this time Simpson had loaned approximately $1,828,000 of his own funds to Alpha and had brought in substantial additional funds from third parties. The first discussion of closing the corporation took place. Payroll needs during this time were hundreds of thousands of dollars per week, and the payroll account was insufficiently funded. Buth flew out of the country to speak about the problem with Simpson, who was on holiday. According to Simpson, prior this visit by Buth, Simpson thought that Alpha was on track and believed he had raised sufficient capital to meet the corporation's projected needs. Recognizing that more capital was necessary, Simpson agreed to provide minimum monies to meet day-to-day operations.

During this trip, Buth, an attorney, advised Simpson that Simpson risked personal liability by serving as President and board member of Alpha. Buth further advised Simpson not to write personal checks, corporate checks, or have his name on a checking account. Simpson resigned as President and became Senior Advisor to the President. Buth was officially elected President and Chief Executive Officer of Alpha at a January 6, 1986 board meeting. Simpson, under his new title, was identified

---

**2.** Alpha's promotional literature indicates that the corporation tried to capitalize on the infor-

mation industry boom predicted in John Naisbitt's book *Megatrends.*

as an officer of the corporation in Alpha's promotional documents.

When Simpson returned from vacation, he held marathon telephone conversations with Buth and other personnel every Friday and other days on an ad hoc basis. Buth claims he called Simpson with a list of questions, concerns and priorities and that Simpson would make the decisions. Roberts stated that Simpson's decisions on priorities included "Who to pay. Who not to pay. Whether or not to mail the checks. What projects to concentrate on. Who to fire, who to hire. Practically everything." (A.S. Roberts Dep. at 103.) Buth's notes regarding a February 12, 1986 phone conference with Simpson reflect concern for employees' morale, concern for payment of their wages, fear of company failure and a need for additional cash. Simpson claims that he did not make any specific decisions, but merely told the officers whether or not funds were available.

According to Buth, Simpson rejected Buth's attempts to call a Board of Directors' meeting in December 1985 and a shareholders' meeting in March 1986. On December 19, 1985, Simpson directed Buth to give Simpson's secretary, Judith I. Riley, a raise and the new title of Vice–President of Corporate Communications. While Simpson was away from Indianapolis, Riley functioned as Simpson's in-house representative at Alpha's corporate offices. Riley remained with Alpha until August 1986, when she and Simpson were the only two persons left.

Simpson continued to inject money into Alpha at the end of 1985 and the beginning of 1986. In January 1986, Alpha met payroll only after Simpson transferred $200,-000 specifically to make the payment. By February 15, 1986, Simpson had funded Alpha with approximately $2.25 million and said he would provide up to $.75 million more. Buth asked Simpson for a sufficient amount of money so that Buth need not call on a daily basis to stave off looming financial disasters; Simpson rejected this request. Consultants recommended obtaining outside venture capital for Alpha, but this proposal failed because Simpson refused to subordinate his interests to outside venture capitalists' desire for exclusive control.

On March 3, 1986, Buth shut down three of the four divisions of Alpha, leaving only the Public Records Division in Shelbyville, headed by Dennis Gershowitz ("Gershowitz"), still in place. Buth furloughed indefinitely the whole Indianapolis staff; he tendered his resignation to the Chairman of the Board of Directors on March 14, 1986. The Public Records Division remained active because it had ongoing contracts. Alpha had no contingency plan in place to ensure that employees who continued to work would be paid. Simpson claims that he learned about Buth's actions only after the fact; Simpson was unaware any employees remained unpaid, because he never received a demand to deposit payroll funds for them. (Simpson Dep. at 40, 42.)

Gershowitz, Vice–President and General Manager of the Public Records Division, considered Simpson to be President of Alpha because Simpson was giving the managers all the directions. When Alpha missed payroll in April 1986, Gershowitz telephoned Simpson to ask how the company was going to get the money to pay the employees. Prior to that week, Simpson had deposited money to meet the payroll demands when the corporation needed it. Simpson directed Gershowitz by phone to tell the workers that Simpson was trying to get the money in, and they had a choice of continuing to work or going home. Simpson later told Gershowitz that the employees would be paid, but a little late. The following week Simpson assured Gershowitz the money was coming in, but Gershowitz told the employees that he personally did not think it would. Simpson claims he was unaware that there was insufficient money to pay the payroll for the week ending April 16, 1986. (*Id.* at 42.) By the end of April, Alpha had stopped paying most of its employees, except for a few of the executives who remained.

After Alpha ceased meeting its payroll, it continued to pay other items considered critical. These items included the office lease for Shelbyville, telephone, power and

light, some rental cars, security services, microfilm readers, heating and cooling repairs and courier services. In his deposition, Simpson stated that he thought all employees were paid and that, as before, he made no specific decisions regarding which bills would be paid because he merely provided the funds. (*Id.* at 36–37.)

Richard Wilcox ("Wilcox") was hired as controller of Alpha on March 10, 1986 and left on July 15, 1986. When hired, Wilcox knew that Buth was gone and that the accounting department had departed also. His job was to get the computer going again, get the payroll running and make sure people and accounts were paid. Wilcox, Gershowitz and others would meet in Gershowitz's office every couple of days to have a telephone conference with Simpson. These calls lasted one and one-half to two hours. Discussions centered on the most pressing accounts payable and payroll obligations due that week. According to Wilcox, Simpson made the decisions as to which vendors to pay.

Alpha's staff dwindled through April and June 1986. Gershowitz left Alpha voluntarily in July 1986. Alpha closed its doors after the Internal Revenue Service levied a tax lien on the corporation. During these waning months, as the possibility of losing his total investment became a reality, Simpson continued to oversee the corporation. During the fiscal year July 1, 1985 to June 30, 1986, Alpha lost $4,392,000 on sales of $870,000. The May 31, 1986 balance sheet showed outstanding payable accounts to employees of $244,331 in net accrued wages, $75,106 in accrued contract labor and accrued employee benefits of $12,762.

On August 6, 1986, Alpha filed a petition seeking protection under Chapter 11 of the Bankruptcy Code. That petition was dismissed on April 27, 1988.

Plaintiff brought this action to enjoin Simpson from violating the provisions of the FLSA and to recover unpaid minimum wages and overtime compensation owed to Alpha's employees, together with an equal additional amount as liquidated damages. An exhibit attached to the Complaint alleges that some three hundred Alpha employees were paid less than the statutory minimum for their work performed between April 16, 1986 and May 31, 1986.

## II. DISCUSSION

Simpson originally filed this motion as a Motion to Dismiss for failure to name a proper party; that motion is governed by Federal Rule of Civil Procedure 12(b)(6). Matters outside the Complaint were presented and considered to resolve this issue. When these matters were considered, Simpson's motion was converted to a Motion for Summary Judgment on the issue of whether Simpson is an "employer" under the Act. Fed.R.Civ.P. 12(b)(6). Simpson's Motion for Summary Judgment is governed by Rule 56, which provides that Simpson shall prevail if the motion and all other submissions "show that there is no genuine issue as to any material fact and that [Simpson] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, this Court views the submissions in the light most favorable to the party opposing the motion. *Morgan v. Harris Trust & Sav. Bank,* 867 F.2d 1023, 1026 (7th Cir.1989) (per curiam). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ If no material facts are in question, then it is a matter of law whether Simpson was an "employer" of the Alpha employees at the time the violation occurred; if the facts are undisputed, then the only issue is the legal effect of those facts. *Dole v. Elliott Travel & Tours,* 942 F.2d 962, 965 (6th Cir.1991); *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1206 (7th Cir. 1986) (question of law whether party is a joint employer under FLSA); *Patel v. Wargo,* 803 F.2d 632, 634 (5th Cir.1986) (question of law whether party is an employer under FLSA). Although most of the evidence indicates that Simpson was a statutory employer, Simpson's deposition testimony places some material facts at issue. For the reasons discussed below, the Court

holds that a genuine issue of fact exists on this issue and that summary judgment cannot be granted.[3]

The Secretary of Labor alleges that Simpson violated the Fair Labor Standards Act, 29 U.S.C.A. §§ 201, *et seq.*, as amended (West 1978 & Supp.1991). The Act requires an "employer" to pay each employee a minimum hourly wage; the provision in effect at the time period in question stated as follows:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>> (1) [N]ot less than $3.35 an hour after December 31, 1980, except as otherwise provided in this section;

29 U.S.C.A. § 206(a) (West 1978). In addition, an employer must pay an employee an overtime rate of at least one and one-half times the regular rate for every hour worked beyond the maximum of forty hours per week. 29 U.S.C.A. § 207(a)(2). A willful violation of these provisions may subject the employer to criminal penalties. 29 U.S.C.A. § 216(a). Any violation, regardless of the employer's intent, provides the employees a cause of action:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C.A. § 216(b). The Secretary of Labor may bring suit on behalf of the affected employees if any employee files a written request. 29 U.S.C.A. § 216(c).

■ The duty to meet the requirements of the Act falls upon "employers" only. Central to the issue raised in Defendant's motion is the Act's definition of an "employer," which reads as follows:

> "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee....

29 U.S.C.A. § 203(d). There is no question that the corporate entity Alpha Systems Resources is an employer under the Act. The question presented is whether Simpson was also an employer of Alpha's employees within the meaning of the Act. It is well settled that there may be more than one employer responsible for violations of the Act. *Falk v. Brennan,* 414 U.S 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973); *Elliott Travel,* 942 F.2d at 962 ("The FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA."). If Simpson, in his individual capacity, was not a statutory employer of the Alpha employees when the alleged violations occurred, then Simpson cannot be personally liable for the FLSA violations.

■ At the outset, it is instructive to consider *why* the question of whether Simpson was an employer is relevant. Because liability hinges on the label of "employer," that definition is designed to include persons who are in fact responsible for causing violations of the Act. Because just about any supervisor, officer, or director may "act in the interest of the employer," the courts look to the parties exercising significant control over the employment relationship. If directors or officers or other employees have such control over the corporate entity that their decisions determine whether a violation occurs, then the Act considers them employers liable for the harm they cause. *Riordan v. Kempiners,* 831 F.2d 690, 694 (7th Cir.1987).[4]

---

**3.** The Secretary of Labor did not file a cross-motion for summary judgment. By failing to do so, the Secretary seemingly conceded that summary judgment cannot be granted in her favor on the facts developed at this stage of the case. This issue was somewhat confused, because the Secretary filed a Statement of Material Facts as to Which There Is No Genuine Issue

and Proposed Conclusions of Law, but failed to state which facts remain in issue.

**4.** The Seventh Circuit held that an employee may be named as a defendant in an individual capacity under the broad definition of "employer" in the Act. Significantly, the court held that an employee may be liable if he or she has supervisory authority over the employees and

The FLSA statutory definition of an "employer" is a sui generous concept, not bounded by tests provided by the common law. *Elliott Travel,* 942 F.2d at 965; *McLaughlin v. Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir.1989). The "economic reality" of the employment relationship controls, rather than formalistic labels or common law concepts of agency. *Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961). The Act is remedial in nature and is intended to identify responsible parties without obfuscation by legal fictions applicable in other contexts. An analysis must focus upon the totality of the circumstances, underscoring the economic realities of the employment relationship. *Donovan v. Sabine Irrigation Co., Inc.,* 695 F.2d 190, 194 (5th Cir. 1983).

▬▬▬ The FLSA must be construed liberally to apply to the furthest reaches consistent with congressional direction. *Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959). The Act is humanitarian and remedial in nature and must be constructed to effect Congress' purpose, which was to protect the country's workers. *Donovan v. Grim Hotel Co.,* 747 F.2d 966, 971 (5th Cir.1984). Against this backdrop, tests developed by the courts focus on the reality of which persons or entities actually controlled the economic relationship with the employees. The issue is not whether an individual controlled every aspect of the employees' conduct, *Elliott Travel,* 942 F.2d at 966; the issue in FLSA cases is whether the individual had control over the alleged violation of the Act. *Grim Hotel,* 747 F.2d at 972 ("It was only [the defendant owner] who could authorize compliance with the Fair Labor Standards Act."). Thus, this is really a question of duty: Based upon their control over decisions causing the violations of the Act, which persons had a duty as a statutory employer not to violate the Act?

A host of decisions from federal courts of all levels make clear that individuals may have such control over a corporation's affairs that they may be personally liable for FLSA violations. The Supreme Court noted years ago that the "expansiveness" of the Act's definition allows individuals to be employers of persons with whom the individuals have no direct contractual relationship. *Brennan,* 414 U.S. at 195, 94 S.Ct. at 431 (substantial control of the terms and conditions of employees' work creates statutory employer status).

▬▬▬ Addressing the "economic realities" of individual cases, courts have found liable individuals occupying a range of corporate positions and exercising various degrees of control. In each instance, a person must take an active role in the operation of an enterprise to incur personal liability. *Brennan,* 414 U.S. at 195, 94 S.Ct. at 431; *Patel,* 803 F.2d at 638. Personal liability may arise from a significant ownership interest in the corporation coupled with operational control of significant aspects of the corporation's day-to-day functions. *Elliott Travel,* 942 F.2d at 966. A general manager may be personally liable for FLSA violations if he or she acted on behalf of the corporation to cause the violations. *Brock v. VAFLA Corp.,* 668 F.Supp. 1516 (M.D.Fla.1987). A corporate officer may be personally liable even if he or she has no ownership interest, if the officer "effectively dominates its administration." *Sabine,* 695 F.2d at 194. Activities of officers or directors of closely-held corporations are viewed carefully to determine whether those parties have exercised sufficient control to be personally liable. *Grim Hotel,* 747 F.2d at 972; *Sabine,* 695 F.2d at 194.

▬▬▬ Courts have considered financial control over a corporation a significant factor in determining whether an individual meets the statutory definition of an employer. *Grim Hotel,* 747 F.2d at 972 (imposed liability on majority shareholder who "held [corporations'] purse strings and guided their policies."); *Elliott Travel,* 942 F.2d at 966 (majority owner "controlled the purse strings"). This kind of financial control becomes almost conclusive when it in-

"was responsible in whole or part for the alleged violation." *Id.*

volves the decision to keep a failing business in operation. An individual may become personally liable if he or she decides to keep employees working despite of the corporation's inability to meet its statutory duty to pay the employees. *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983).

Some evidence, if believed, indicates that Simpson had even more than "line-item-veto" control over Alpha's financial matters during the relevant time in 1986. In fact, that same evidence indicates that no substantive decisions were made without his approval. The corporation had been insolvent almost from the day that Simpson purchased his initial interest; as proved in July 1986, Alpha could not survive long without Simpson's constant financial backing. Simpson had hired most of the executive-level employees. Although Alpha is certainly an employer of the employees, its officers had little control over the alleged violations because they were arguably beholden to Simpson's direction. The FLSA violations here occurred, if at all, because Simpson turned off the financial tap flowing from his personal resources to the corporation and its employees after it floundered during April and May. Of course, Simpson was entitled to stop throwing good money after bad, but he was not permitted to leave the employees high and dry with unpaid wages.

This case is different from many FLSA cases, because the violation alleged here occurred when the corporation did not meet its final payroll obligations to persons employed just prior to their termination. This situation is distinct from cases where functioning corporations pay their employees less than the statutory minimum. In those cases, it is logical to consider how much control certain individuals had over employment decisions related to wages and hours. If the violation relates to unlawfully low hourly wages, then the logical question is which individuals are responsible for setting these wages. These controlling persons have a duty to comply with the FLSA.

In this case, the event that caused the alleged FLSA violations was not establishment of an unlawfully low wage scale.

These employees simply were not paid. This case is factually similar to *Donovan v. Agnew,* in which ninety-nine hourly employees sought payment for work performed two weeks before their plant closed. The two defendants comprised the entire board and officer corps of the parent corporation of the corporation with the closed plant. The First Circuit affirmed the district court's summary judgment finding that the defendants were employers within the meaning of the Act. 712 F.2d at 1514.

Based upon their pervasive control over the subsidiary corporation, the two defendants "undertook a calculated risk to keep the plant open, in spite of layoff recommendations from the bank, the union, and their own managers, and in spite of the company's inability fully to fulfill its statutory obligations to its employees." *Id.* at 1511. The defendants "personally made decisions to continue operations despite financial adversity during the period of nonpayment." *Id.* at 1514. In another relevant case, the court held an individual liable partly because "the corporation's very survival depended upon [the defendant's] largesse, with his decision to terminate all financial aid precipitating its near-demise." *Sabine,* 695 F.2d at 195. It is disputed whether Simpson similarly controlled Alpha. Through his pervasive control over Alpha's executives and finances Simpson may have had the power to determine whether the FLSA would be violated or not.

 The event causing the violation may have been Simpson's decision to meet some of Alpha's obligations while failing to provide sufficient funds to meet Alpha's payroll obligation; however, merely withholding funds does not a statutory employer make. A plethora of conditions preceding that event may establish that Simpson had dominion over the corporation as a whole, and near complete control over financial matters in particular. Simpson, who determined weekly whether there would be any cash in Alpha's accounts, seemingly became the undisputed asset arbiter behind the Alpha corporate shell. If the other deponents are believed, then Simpson's independent judgment controlled

whether Alpha had funds sufficient to meet payroll during the period in question. These deponents also stated that Simpson had control over which accounts payable would be satisfied whenever Alpha did have funds to disperse. These facts, if believed, would establish that Simpson had almost total control over the violations alleged, because his decision to keep the corporation operating and then withhold payroll funds caused the violation alleged. That may or may not be the "economic reality" of the situation.

Simpson searched for technical distinctions to avoid liability. Simpson claimed that, since he did not officially hold the title of President after March 1986, he cannot be held personally liable for violations occurring after that time. As is amply demonstrated by prior cases, corporate titles are not determinative of personal liability for FLSA violations. *See e.g., Agnew*, 712 F.2d at 1510. "No one factor is dispositive; rather, it is incumbent upon the courts to transcend traditional concepts of the employer-employee relationship and assess the economic realities presented by the facts of each case." *Sabine*, 695 F.2d at 194. Economic reality looks to the substance of a person's control, not the title the person holds.

Simpson further argues that he was merely an investor looking after his investment in a prudent manner.[5] Simpson counsels the Court not to discourage investment in failing enterprises by making the investors personally liable. These claims wholly miss the mark. If supported by facts adduced at trial, the Secretary of Labor's claims would establish that Simpson's financial control and force of personality replaced the usual corporate structure. If the corporation would have ceased operations or reduced its payroll to a figure it could consistently meet, then there would have been no unpaid employees. However, Alpha remained viable solely because Simpson controlled it through his money and potentially undisputed decision-making

authority. Whether he did so to chase a dream of creating a national corporation or to protect his substantial investment is irrelevant. If Simpson had the control alleged, then he was not merely a passive investor exercising control merely to protect his investment. Because employees are protected by laws like FLSA, the *kind* of control Simpson allegedly exercised brings with it responsibilities and risk beyond that incurred by a passive investor.

Because Simpson was the moving party on this motion, he understandably could not argue that there are genuine issues of fact regarding his actions in the interest of Alpha's relationship to its employees. Regardless, genuine issues of fact remain regarding Simpson's control over the corporation during the relevant time period. Among other points, the evidence is in dispute regarding Simpson's control over the decision to keep the corporation operating in March and April 1986. As the *Agnew* case correctly demonstrates, a person may be individually liable if he or she makes such a decision after having such control over employment relationships that the person is aware that the employees may suffer. It is unclear whether Simpson had such information about the employees that he was aware they would not be paid. To hold Simpson liable as a statutory employer of the employees remaining in late March and April, this Court would have to weigh conflicting testimony regarding the extent to which Simpson had control over the executives and their decisions. These genuine issues of fact must be presented to the jury for their consideration.

## III. CONCLUSION

For the reasons stated above, the Court DENIES Defendant's Motion for Summary Judgment.

5. "Once Buth entered the picture in November, 1985, the Defendant became only a 'deep pocket'. Certainly he helped to determine, with the aid of Buth, what bills were to be paid because he was providing the money. But, after all, it was his money." (Def.'s Am.Mot.Dismiss at 8.)