Jose **MARTINEZ, Plaintiff,**

v.

**DEAF SMITH COUNTY GRAIN PROCESSORS, INC., Cliff A. Skiles, Jr., and Cottonwood Cattle Co., Inc., Defendants.**

Civ. A. No. CA–2–81–228.

United States District Court,
N.D. Texas,
Amarillo Division.

March 1, 1984.

Carmen E. Rodriguez, El Paso, Tex., for plaintiff.

James A. Besselman, Amarillo, Tex., for defendants.

## MEMORANDUM ORDER

MARY LOU ROBINSON, District Judge.

Plaintiff has brought this suit alleging violations of the Fair Labor Standards Act's minimum wage, overtime and anti-retaliation provisions, 29 U.S.C. § 201 *et seq.*, and of the Farm Labor Contractor Registration Act, 7 U.S.C. § 2041 *et seq.* The case was tried to the Court on October 28, 1983, and the following constitutes this Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

### *Background*

Plaintiff is an Hispanic farm worker who was hired by Defendant Cliff Skiles, Jr., on March 21, 1981. Skiles was the principal owner, manager and supervisor of the other two defendants: Deaf Smith County Grain Processors (DSCGP) and Cottonwood Cattle Company. Cottonwood's principal business activity was feeding, pasturing and raising cattle, primarily on the South Half of Section 37, K–4, in Deaf Smith County.

DSCGP was in the business of buying, cleaning and selling food corn. It leased a grain elevator and cleaning equipment from Cottonwood, which was located on the South Half of Section 37, K–4, in Deaf Smith County, to conduct its principal business activities. Corn grown on Skiles' land was processed together with corn purchased and trucked in from other farms. DSCGP had fully automated cleaning and sacking equipment which could be operated by one man. After cleaning and sacking, manual labor was needed to stack the sacks of corn as they came off the sacking machine. Corn for human consumption was shipped in interstate commerce while the cattle feed corn went to Cottonwood as part of DSCGP's lease payments. Only

5–7% of the corn was actually sacked, however. The majority of the corn, 93–95%, was sold in bulk after cleaning and grading. In 1981, DSCGP was processing one million pounds of corn monthly.

During Plaintiff's first three weeks of employment, he performed general farm hand duties, including repairing and painting fences and water troughs and taking care of Cottonwood's cattle on a 70-acre farm in Deaf Smith County, partially owned by Skiles and leased by Cottonwood. During the remaining period of his employment, from approximately mid-April through August 28, 1981, Plaintiff worked and lived on the South Half of Section 37, K–4, in Deaf Smith County. He continued to perform some duties for Cottonwood and Skiles, and began working part-time at DSCGP. Jake Green, DSCGP's manager at this time, testified that Plaintiff worked at DSCGP 12–15 times per month, up to 15–20 hours per week.

Plaintiff was directly supervised by Skiles throughout his employment. Defendants admit that they did not maintain written records of the number of hours and days per week which Plaintiff worked and did not provide him with wage receipts.

### FLSA Coverage

■ "The Fair Labor Standards Act is a Federal statute of general application which establishes minimum wage, overtime pay, equal pay and child labor requirements that apply as provided in the Act. These requirements are applicable, except where exemptions are provided, to employees in those workweeks when they are engaged in interstate or foreign commerce or in the production of goods for such commerce or are employed in enterprises so engaged within the meaning of definitions set forth in the Act. Employers having such employees are required to comply with the Act's provisions in this regard unless relieved therefrom by some exemption in the Act...." 29 CFR § 780.1 (1981). An employer who claims an exemption under the Act has the burden of showing that it applies. *Mitchell v. Kentucky*

*Finance Co.*, 359 U.S. 290, 291, 79 S.Ct. 756, 757, 3 L.Ed.2d 815 (1959).

■ As a threshold matter, the Court finds that the Defendants were joint employers of Plaintiff for purposes of the FLSA. *See Falk v. Brennan*, 414 U.S. 190, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973). This finding is based on the totality of the circumstances and the economic realities of Plaintiff's employment. *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir.1983). *See* 29 CFR § 791.2(a) (1981) ("[I]f the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek"). Since Skiles owns all of Cottonwood Cattle Co. and 90% of DSCGP, and they are all located on the same piece of land, they also fit cleanly into 29 CFR § 791.2(b)(3) (1981) ("Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common contract with the other employer" a joint employment relationship will generally be considered to exist).

■ Defendants' principal contention is that they are exempted from the wage and hour provisions of the Act by Section 13(a)(6), 29 U.S.C. § 213(a)(6) (1981), which provides in relevant part:

[The minimum wage and overtime pay requirements] of this title shall not apply with respect to—

.      .      .      .      .

(6) Any employee employed in agriculture: (A) If such employee is employed by an employer who did not, during any calendar quarter during the preceding year, use more than 500 man-days of agricultural labor. . . .

Since the conditions specified in the language of the Act are "explicit prerequisites to exemption", *Arnold v. Kanowsky*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960), the first inquiry is whether Plaintiff was employed in agriculture within the meaning of the Act. Section 3(f) of the Act, 29 U.S.C. § 203(f) (1981), defines "agriculture" as follows:

> "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 15(g) of the Agricultural Marketing Act, as amended), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

The term "livestock" includes cattle, 29 CFR § 780.120, thus Plaintiff's work for Cottonwood appears to fall within the "raising of livestock" portion of the primary meaning of agriculture and does not defeat application of the exemption. Nor does the 500 man-day exception to the agricultural exemption apply in this case for the March 21, 1981, to mid-April, 1981, period. The maximum number of man-days used by the Defendants in any calendar quarter of 1980 was 426. Even assuming, as Plaintiff argues, that 29 CFR § 780.-158(a) (1981) requires the bookkeepers employed by Skiles at Livestock Health Products, Inc., to be included in this total, the result is not changed. Skiles testified that Livestock Health Products employs one full-time bookkeeper and an occasional part-timer. For a 13-week quarter, the full-time bookkeeper would add 65 man-days, bringing the 1980 third quarter up to 491. No evidence was presented on how many man-days any part-timer worked in any of the quarters, thus the Defendant's evidence that no more than 500 man-days were used in any quarter stands unrefuted.

■ Plaintiff's work for DSCGP, however, is another matter. None of the activities listed under the primary meaning of agriculture covers DSCGP's corn processing operation, nor does this operation fit within the secondary meaning of agriculture.

"Practices ... performed by a farmer or on a farm" must be performed as an incident to or in conjunction with "such farming operations" in order to constitute "agriculture" within the secondary meaning of the term. 29 CFR § 780.137 (1981). As the Fifth Circuit has held, however:

> [P]rocessing on a farm of commodities produced by other farmers is incidental to, or in conjunction with, the farming operation of the other farmers and not incidental to, or in conjunction with, farming operations of the farmers on whose premises the processing is done. Such processing is therefore not within the definition of agriculture.

*Mitchell v. Huntsville Wholesale Nurseries*, 267 F.2d 286, 290 (5th Cir.1959). The Department of Labor takes a similar view:

> No practice performed with respect to farm commodities is within the language under discussion by reason of its performance on a farm unless all of such commodities are the products of that farm. Thus, the performance on a farm of any practice, such as packing or storing, which may be incidental to farming operations cannot constitute a basis for considering the employees engaged in agriculture if the practice is performed upon any commodities that have been produced elsewhere than on such farm.

29 CFR § 780.141 (1981). Thus while Plaintiff was working for DSCGP, he was not "employed in agriculture" within the meaning of the Act. This same result is

achieved if the Supreme Court's test for determining whether a particular type of activity is agricultural is applied:

> [T]he question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity.

*Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 761, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672 (1949). DSCGP is separately incorporated from Skiles' other agricultural pursuits. Skiles owns 90% of the stock in DSCGP and has caused DSCGP to enter into leases with other entities controlled by Skiles. DSCGP processes corn from other producers and maintains its own books. It certainly appears to be "separately organized as an independent productive activity."

■ Although the legislative history of the FLSA reveals that Congress meant the agricultural exemption to be broad, *see, e.g., Donovan v. Frezzo Bros., Inc.,* 678 F.2d 1166, 1173 (3d Cir.1982), application of the exemption is limited to situations which "plainly and unmistakably come within the statute's terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). Since Plaintiff was not "employed in agriculture" within the meaning of the Act, the agricultural exemption is not available to the Defendants. (Since the Court has determined that Plaintiff was not "employed in agriculture" from mid-April, 1981, through August 28, 1981, for purposes of Section 13(a)(6)(A), 29 U.S.C. § 213(a)(6)(A) (1981), the 500 man-day exception to the exemption is not relevant.)

As evidenced by Jake Green's testimony that Plaintiff worked at DSCGP 12–15 times per month, the Court concludes that Plaintiff performed some work for DSCGP each week from mid-April, 1981, through August 28, 1981. This performance of non-exempt work each week is adequate to bring all of Plaintiff's work from mid-April to August 28 under the Act's coverage. As the regulations provide:

> Where an employee in the same workweek performs work which is exempt under one section of the Act and also engages in work to which the Act applies but is not exempt under some other section of the Act, he is not exempt that week, and the wage and hour requirements of the Act are applicable.

29 CFR § 780.11 (1981).

### *Dawn to Dusk or 9 to 5?*

■ Defendants failed to keep records of the hours worked by the individual plaintiffs as required by 29 U.S.C. § 211(c) (1981). This section places on the employer the obligation of keeping accurate records of the hours worked by his employees. *See Castillo v. Givens,* 704 F.2d 181, 194 (5th Cir.1983). Where such records have not been kept,

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the Court may then award damages to the employee, even though the result be only approximate.

*Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 1192–93, 90 L.Ed. 1515 (1946).

The testimony in this case as to the number of hours worked by the Plaintiff is contradictory. Plaintiff testified that he worked from sunrise to sunset, seven days per week, from March 21, 1981, through August 28, 1981. Taking April 10, 1981, as the end of the initial three-week period

during which Plaintiff worked on the 70-acre farm and not for DSCGP, Plaintiff performed work covered by the FLSA for a 20-week period; totaling 800 regular hours and 740 overtime hours based on the assumption that sunrise to sunset, less the lunch break testified to each day, generates an average of 11 working hours/day for the March 21 to August 28 period.

Cliff Skiles and Jack Green, the owner of the 10% minority block of DSCGP stock, testified that the Plaintiff was never up at the crack of dawn, that someone had to go get him every morning, and that he took 1–1½ hour lunches. Further, Plaintiff stopped work between 4:30 and 5:00 each afternoon, never worked more than 40 hours/week, even including an occasional half-day on Saturdays, and lay around the bunkhouse drinking beer on Sundays.

■ From this record, the Court must make a "just and reasonable inference." Bearing in mind Congress' declaration that the policy behind the FLSA is "to correct and as rapidly as practicable to eliminate [labor conditions detrimental to the health, efficiency, and general well-being of workers]", 29 U.S.C. § 202(b), and the Supreme Court's admonition that

> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act. And even where the

lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances.

*Anderson*, 328 U.S. at 688, 66 S.Ct. at 1192, this Court finds that an inference that the Plaintiff worked 60 hours/week is just and reasonable. For the 20-week period, then, Plaintiff worked 800 regular hours and 400 overtime hours.

### The Wages Received

The minimum wage in effect and applicable to Plaintiff at the time he performed his work was $3.35/hour. 29 U.S.C. § 206(a) (1981). Thus, under the FLSA, the Plaintiff was entitled to the following sum:

$$800 \text{ hours} \times \$3.35/\text{hour} = \$2680$$
$$400 \text{ hours} \times \$5.025/\text{hour} = 2010$$

| | |
|---|---|
| Total | $4690 |

Plaintiff actually received the following wages by check:

| | |
|---|---|
| March 21, 1981 | $ 145.16[1] |
| May 19, 1981 | 450.00 |
| June 17, 1981 | 450.00 |
| July 29, 1981 | 450.00 |
| August 25, 1981 | 450.00 |
| August 28, 1981 | 225.00 |
| Total | $2,170.16 |

---

1. Plaintiff came to work for the Defendants on March 21, 1981. He and Fernando Espinosa were brought to Skiles' ranch by a third man whose identity is unknown. The third man informed Skiles that Plaintiff and Espinosa owed him money, but Skiles said he didn't want to have anything to do with that. After some discussion, Skiles agreed to pay Plaintiff's and Espinosa's first month's wages in advance. Skiles took a check out of his wallet and made it out to Fernando Espinosa in the amount of $900. Espinosa's endorsement appears on the back of this check with the endorsement of one "Daniel Garza" beneath Espinosa's.

The regulations provide that:

> Where an employer is directed by a voluntary assignment or order of his employee to pay a sum of the benefit of the employee to a creditor, donee, or other third party, deduction from wages of the actual sum so paid is

not prohibited: *Provided,* That neither the employer nor any person acting in his behalf or interest, directly or indirectly, derives any profit or benefit from the transaction. In such case, payment to the third person for the benefit and credit of the employee will be considered equivalent, for the purposes of the Act, to payment to the employee.

29 CFR § 531.40 (1981). While it seems remarkable that Skiles, who speaks little Spanish, and Plaintiff, who speaks little English, reached a voluntary assignment of the first month's wages, Plaintiff never testified that the payment was involuntary or presented any evidence that Skiles derived any profit or benefit from the transaction, or that the third man was acting in Skiles' behalf or interest.

The $450 represented the first month's wages. Of this first month, from March 21 to April 20,

Defendants also furnished Plaintiff with room and board for the entire period covered by the Act. Section 3(m) of the Act provides that " '[w]age' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees...." 29 U.S.C. § 203(m) (1981). The Administrator, the Secretary of Labor, has determined that:

(a) The term "reasonable cost" as used in section 3(m) of the Act is hereby determined to be not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees.

(b) "Reasonable cost" does not include a profit to the employer or to any affiliated person.

(c) Except whenever any determination made under § 531.4 is applicable, the "reasonable cost" to the employer of furnishing the employee with board, lodging, or other facilities (including housing) is the cost of operation and maintenance including adequate depreciation plus a reasonable allowance (not more than 5½ percent) for interest on the depreciated amount of capital invested by the employer: *Provided,* That if the total so computed is more than the fair rental value (or the fair price of the commodities or facilities offered for sale), the fair rental value (or the fair price of the commodities or facilities offered for sale) shall be the reasonable cost. The cost of operation and maintenance, the rate of depreciation, and the depreciated amount of capital invested by the employer shall be those arrived at under good accounting practices.

29 CFR § 531.3 (1981). Skiles customarily furnishes room and board to his employees

by putting them up in the bunkhouse and furnishing the bunkhouse with food.

The bunkhouse had just been constructed at the time Plaintiff began work. Skiles testified that construction costs were approximately $20,000 and that, with depreciation and interest, the bunkhouse costs him around $300–$400 per month. His best estimate of the cost of providing lodging to the Plaintiff was $150/month. Plaintiff presented no evidence to the contrary. The Court finds that $150/month does not exceed the fair rental value of the facilities and accepts this amount as the reasonable cost to Skiles. Thus the following sum should be included in the amount Plaintiff received as wages:

| | | |
|---|---|---|
| April | $100 | (= $150 x 20/30 days) |
| May | 150 | |
| June | 150 | |
| July | 150 | |
| August | 135.48 | (= $150 x 28/31 days) |
| Total | $685.48 | |

Board is more difficult to estimate. Cattle, vegetables and eggs were supplied to the bunkhouse from the ranch itself. In fact, the cowboys took these items out of the garden and the henhouse themselves, thus no accurate quantity is available. Skiles also had groceries purchased in town, generally by an agent, for both the bunkhouse and the main house. Defendants introduced into evidence a series of checks paying for bunkhouse supplies, totaling $1527.26 for the 23-week period. Distributing this expense evenly over the entire period, Skiles expended $1527.26 × 20/23 weeks = $1328.05 for bunkhouse supplies during the 20-week FLSA period. Since this food was also consumed by a co-worker, the Court will divide the sum in half to reach the finding that Plaintiff received board which reasonably cost Defendants $664.02.

Thus Plaintiff received total wages, within the meaning of the Act, as follows:

Plaintiff was employed for 3 weeks (21 days) in work which was exempt from FLSA, as determined above. Consequently, 10 days of the 31-day month were covered by FLSA and the

portion of the $450 attributable to this period is $450 × (10/31) = $145.16. To effectuate the broad remedial purpose of the Act, the Court has rounded the penny down.

```
Checks ....................... $2170.16
Lodging ......................   685.48
Board  .......................   664.02
                   Total     $3519.66
```

The amount, then, of Plaintiff's unpaid minimum wages and overtime compensation is ($4690 – $3519.66 = ) $1170.34.

## Liquidated Damages

Section 16(b) of the Act provides that: Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee ... affected in the amount of [his] unpaid minimum wages, or [his] unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b) (1981). Plaintiff is thus entitled to $1170.34 as liquidated damages for violations of the FLSA.

## Retaliation

The Court now turns to the most difficult aspect of this case: whether Defendants retaliated against Plaintiff for filing this FLSA and FLCRA lawsuit by filing a state court claim for breach of the employment contract. As noted above, Plaintiff left the employ of Defendants on August 28, 1981. On October 23, 1981, he filed this suit. On December 7, 1981, Cottonwood Cattle Co., Inc., filed a breach of contract and misrepresentation claim against Plaintiff in the 222d District Court of the State of Texas in Deaf Smith County. Cottonwood had not been named as a defendant in the original complaint. On December 22, 1981, Plaintiff removed the state court suit against him, but this Court remanded the state court suit on June 29, 1982. Plaintiff's concurrent motion to consolidate that suit with this one was denied.

This case was called on this Court's docket on October 11, 1983, and set for trial the

next Monday, the 17th. Two days after docket call, on Thursday, October 13, 1983, the state court suit was tried and judgment entered against Martinez in the sum of $15,000. Martinez, then residing in a rural village outside of Mexico City, did not appear at the trial.

Cottonwood's state court petition alleged that at the meeting on March 21, 1981, Martinez agreed to work until December 1, 1981. Since Martinez left on August 28, according to Cottonwood, it was entitled to damages for breach of contract. The misrepresentation claim was identical: Martinez allegedly "falsely represented" that he would work until December 1. Cottonwood's damages were two-fold:

1. A decline in [Cottonwood's] cattle herd due to the inability of [Cottonwood] to adequately care for the herd for a period of time after [Martinez] quit his job with Plaintiff.

2. Damages to [Cottonwood's] agricultural efforts generally due to [Cottonwood's] inability to adequately look after these efforts for a period of time after [Martinez] quit his employment with [Cottonwood].

Cottonwood itself is a corporation wholly owned by Skiles. In an apparent effort to avoid any possible future federal jurisdiction, Cottonwood pled that its damages were "more than $1,000 and less than $10,000." When questioned at this trial as to why he had waited until December 7 to file the state suit when Martinez had left August 28, Skiles responded that he believed that one couldn't file suit for damages for breach of contract until after the term of the contract had run.

Skiles testified in this case that the agreement he reached with Martinez on March 21 was that Martinez was to receive $450/month in wages plus a bonus of $150/month payable December 1 [2], if Mar-

---

**2.** Because this bonus was never paid, it cannot be considered as part of Plaintiff's wages received. 29 CFR § 531.35 (1981) (" '[W]ages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or

'free and clear' "). Even if paid on December 1, the bonus could not be considered part of Plaintiff's wages for purposes of the FLSA. *See, e.g., Brennan v. Heard,* 491 F.2d 1 (5th Cir.1974); *Rigopoulos v. Kervan,* 140 F.2d 506 (2d Cir. 1943); *Bable v. T.W. Phillips Gas & Oil Co.,* 287

tinez worked until December 1. Each time Skiles paid Martinez, he made out a check for $150 post-dated to December 1 and placed it in his desk drawer. These checks were never given to Martinez nor negotiated.

The 1977 amendments to the FLSA created a private right of action for employees who are retaliated against for filing any complaint or testifying in a FLSA case. 29 U.S.C. § 216(b) (1981). Section 15(a)(3) of the original Act provides that:

[I]t shall be unlawful for any person— to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter....

29 U.S.C. § 215(a)(3) (1981). No court has construed this provision in a factual context similar to this one.

Under virtually identical language in Title VII [3], however, two federal courts have found the filing of a state suit to be retaliation. Both cases involved state defamation suits filed in response to statements made in EEOC complaints. As one court commented, "[o]nly by enjoining suits filed in retaliation for the exercise of protected rights can these rights be ensured.... A literal reading of the statute obviously outlaws all retaliatory acts, including lawsuits filed in state tribunals." *EEOC v. Levi Strauss & Co.*, 515 F.Supp. 640, 643 (N.D. Ill.1981). *See also EEOC v. Virginia Carolina Veneer Corp.*, 495 F.Supp. 775 (W.D. Va.1980), *appeal dismissed*, 652 F.2d 380 (4th Cir.1981).

▪ Essentially the same language in § 8(a)(4) of the National Labor Relations Act [4] recently led the Supreme Court to conclude that filing a civil suit in state court could be a prohibited act of retaliation under the NLRA. *Bill Johnson's Restaurants v. NLRB*, —— U.S. ——, 103 S.Ct. 2161, 2171, 76 L.Ed.2d 277 (1983). As the Court said,

A lawsuit no doubt may be used by an employer as a powerful instrument of coercion or retaliation. As the Board has observed, by suing an employee who filed charges with the Board or engages in other protected activities, an employer can place its employees on notice that anyone who engages in such conduct is subjecting himself to the possibility of a burdensome lawsuit. Regardless of how unmeritorious the employer's suit is, the employee will most likely have to retain counsel and incur substantial legal expenses to defend against it. Furthermore, as the Court of Appeals in the present case noted, the chilling effect of a state lawsuit upon an employee's willingness to engage in protected activity is multiplied where the complaint seeks damages in addition to injunctive relief. Where, as here, such a suit is filed against hourly-wage waitresses or other individuals who lack the backing of a union, the need to allow the Board to intervene and provide a remedy is at its greatest.

·     ·     ·     ·     ·

Therefore, we hold that it is an enjoinable unfair labor practice to prosecute a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights protected by § 7 of the NLRA.

*Id.* at ——, 103 S.Ct. at 2169–2171 (citations omitted). This Court reaches a similar conclusion: filing a lawsuit in state court may be a form of retaliation prohibited under § 15(a)(3) of the Fair Labor Standards Act.

F.2d 21 (3d Cir.1961); *Roland Electrical Co. v. Black*, 163 F.2d 417 (4th Cir.1947); *Dunlop v. Gray-Goto, Inc.*, 528 F.2d 792 (10th Cir.1976).

**3.** "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e–3(a).

**4.** "It shall be an unfair labor practice for an employer—(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter." 29 U.S.C. § 158(a)(4).

The Supreme Court set forth two findings which must be made in order to find that a state suit is a prohibited act of retaliation: (1) that the suit was filed with retaliatory motive, and (2) that the suit lacks a reasonable basis in fact or law. *Id.* at —, 103 S.Ct. at 2173. Here, the timing of the filing and prosecution of the suit against Martinez is a clear indication of the Defendants' retaliatory motive. It is not reasonable to believe that the filing of the state suit shortly after the filing of Martinez's FLSA claim and the trial of that suit in a rural Texas county nearly two years later, and a mere 96 hours before the federal suit was set for trial, was simply fortuitous and not motivated in any way by Martinez's FLSA claim.

The lack of a reasonable basis is a more complex finding on the facts in this case. In *Bill Johnson's Restaurants*, the Supreme Court said:

> In the present case, the only disputed issues in the state lawsuit appear to be factual in nature. There will be cases, however, in which the state plaintiff's case turns on issues of state law or upon a mixed question of fact and law. Just as the Board must refrain from deciding genuinely disputed material factual issues with respect to a state suit, it likewise must not deprive a litigant of his right to have genuine state-law legal questions decided by the state judiciary. While the Board need not stay its hand if the plaintiff's position is plainly foreclosed as a matter of law or is otherwise frivolous, the Board should allow such issues to be decided by the state tribunals if there is any realistic chance that the plaintiff's legal theory might be adopted.
>
> In instances where the Board must allow the lawsuit to proceed, if the employer's case in the state court ultimately proves meritorious and he has judgment against the employees, the employer should also prevail before the Board, for the filing of a meritorious lawsuit, even for a retaliatory motive, is not an unfair labor practice.

*Id.* at —, 103 S.Ct. at 2172. Here, the employer prevailed in its state lawsuit and obtained a judgment against its former employee, Martinez. At no time in the pretrial or trial phase of the state lawsuit was the employer's position "plainly foreclosed as a matter of law or [ ] otherwise frivolous." The employer knew, however, that an FLSA claim was pending in federal court and, as discussed *infra*, that the finding of an FLSA violation by this Court would plainly foreclose as a matter of law its state lawsuit claims.

Herein lies the crucial distinction between this case and *Bill Johnson's Restaurants*. A determination by the NLRB that an unfair labor practice has occurred will not affect an otherwise meritorious state-law claim. The determination by this Court, however, that an FLSA violation has occurred affects the employer's otherwise meritorious state-law claim for breach of contract by depriving it of a reasonable basis in law. This possibility should have been apparent to the parties and stands at the interface between federal labor policy and state law on which Justice Brennan separately commented in *Bill Johnson's Restaurants:*

> While the Constitution protects a person's right to file and prosecute a lawsuit in state court, it does not guarantee that state law, rather than federal law, will provide the ground for decision. In fact, with regard to labor disputes, federal preemption of state law is the rule, not the exception .... Even in areas where state law is not preempted, there may be a federal overlay ....

*Id.* at —, 103 S.Ct. at 2176 (Brennan, J. concurring). Since this Court's finding of an FLSA violation necessarily "determines that controlling federal law bars the [employer's] right to relief" in the state lawsuit, the Court finds that the state lawsuit lacks a reasonable basis in law and is, thus, an act of retaliation prohibited by § 15(a)(3) of the FLSA and enjoinable. *See id.*

### The Remedy For Retaliation

The FLSA provides that:

Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount of liquidated damages.

29 U.S.C. § 216(b) (1981). The courts in both *Levi Strauss* and *Virginia Carolina Veneer* found it necessary to enjoin the state proceedings in order to protect federal rights. Whether such an injunction is appropriate here is a close question.[5]

The first step, however, is to determine whether the anti-injunction statute bars such a remedy.[6] That statute provides:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283 (1983). The Supreme Court has elaborated on when the anti-injunction statute is not a bar:

[I]t is clear that, in order to qualify as an "expressly authorized" exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding.... The test, rather, is whether an Act of Congress, clearly creating a federal right or remedy, could be given its intended scope only by the stay of a state court proceeding.

*Mitchum v. Foster*, 407 U.S. 225, 237–38, 92 S.Ct. 2151, 2159–60, 32 L.Ed.2d 705 (1972). The Court went on to note that "federal courts have found that other Acts of Congress that do not refer to § 2283 or to injunctions against state court proceedings nonetheless come within the 'expressly authorized' language of the anti-injunction statute." *Id.* at 237 n. 25, 92 S.Ct. at 2159 n. 25, *citing Walling v. Black Diamond Coal Mining Co.*, 59 F.Supp. 348, 351 (W.D.Ky.1943), which held that the FLSA is one of the statutory exceptions to the anti-injunction statute.

The rights and remedies created by the FLSA are both clear and uniquely federal. They are certainly enforceable in a federal court. As the Supreme Court has said:

The legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from sub-standard wages and excessive hours.... The statute was a recognition that due to the unequal bargaining power as between employer and employee, certain segments of the population required *federal compulsory legislation to prevent private contracts* on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. [The legislative debates indicate that the prime purpose of the legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage.] To accomplish this purpose standards of minimum wages and maximum hours were provided.... No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act.

*Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706–07, 65 S.Ct. 895, 902–03, 89

---

**5.** Although Plaintiff has not pled for this form of equitable relief, Fed.R.Civ.P. 54(c) provides, in relevant part, that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." This rule allows the Court to grant whatever relief a party is entitled to under the FLSA, whether demanded in the pleadings or not. *See*

*Donovan v. Burger King Corp.*, 675 F.2d 516, 520 (2d Cir.1982).

**6.** This issue was not discussed in *Bill Johnson's Restaurants* because of the Supreme Court's earlier decision in *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971), with regard to the powers of the NLRB.

L.Ed. 1296 (1945) (emphasis added). From these concerns has flowed the federal tradition of scrupulous enforcement of rights under the Act. As the Fifth Circuit has noted, "[t]he FLSA decrees a minimum unconditional payment and the commands of that Act are not to be vitiated by an employer, either acting alone or through the agency of a federal court." *Brennan v. Heard*, 491 F.2d 1, 4 (5th Cir.1974).

■ Here, this Court can only give the FLSA its intended scope by enjoining the parties to this suit from taking any action to enforce or secure any of the benefits of the state court judgment. The employment contract between Cottonwood and Martinez is patently illegal and unforceable. *Brooklyn Savings Bank, supra*. To allow Cottonwood to pursue enforcement of its judgment would vitiate the commands of the Act. Congress never intended that an employee who discovers, partway through an agreed term of employment, that he is being paid less than the minimum wage and who files an FLSA claim, would have an enforceable duty to work the remainder of the agreed term at the subminimum wage. Indeed, as pointed out in *Brooklyn Savings Bank*, the very purpose of the legislation is to prevent such contracts.[7] As noted above, this vitiation cannot be done through the agency of a federal court and certainly it also cannot be done through the agency of a state court.

Such a stay is also consonant with the remedies explicitly suggested under § 216(b). "[E]mployment, reinstatement, promotion, and the payment of wages lost ..." each express a common theme: that the goal of the FLSA's anti-retaliation provisions is, as nearly as possible, to place the employee retaliated against in the same position he would have been in had the retaliation never taken place. By enjoining the state court proceeding, this Court places Martinez in nearly the same position he would have been in had the retaliation never taken place and provides "swift, ef-

fective vindication of federal labor policy." *Bill Johnson's Restaurants*, —— U.S. at ——, 103 S.Ct. at 2176 (Brennan, J., concurring).

### FLCRA Claims

■ Plaintiff's claims under the Farm Labor Contractor Registration Act, 7 U.S.C. § 2041 *et seq.* (1981), suffer from a shared deficiency: no evidence of probative value that Skiles or the "third man" was a farm labor contractor within the meaning of the Act. The Act provides that:

> The term "farm labor contractor" means any person, who, for a fee, either for himself or on behalf of another person, recruits, solicits, hires, furnishes, or transports migrant workers ... for agricultural employment.

7 U.S.C. § 2042(b) (1981). As discussed above, the evidence shows only that Skiles hired Plaintiff and his companion and gave Plaintiff's companion a check covering both workers' first month's wages. No evidence links this check to the third man who brought Plaintiff and his companion to Skiles' ranch.

Since there is, thus, no proof that a farm labor contractor was involved in any part of the dealings between Plaintiff and Defendants, the Court finds that the Defendants did not violate any of the provisions of the Farm Labor Contractor Registration Act.

### Conclusion

The Court finds in favor of the Plaintiff on his FLSA claims and determines his compensatory damages to be $1,170.34 and his liquidated damages to be $1,170.34. The Court finds in favor of the Defendants on all of the FLCRA claims. Additionally, the Court finds that Defendants violated the anti-retaliation provisions of the FLSA and enjoins the parties to this suit from taking any action to enforce or secure any of the benefits of the state court judgment. Pursuant to 29 U.S.C. § 216(b), Plaintiff is

---

**7.** If the employer ultimately prevails in the FLSA suit, of course, then the employee could

be held liable for breach of contract.

awarded reasonable attorneys' fees, in an amount to be determined later by the Court, and his costs of action.

LET JUDGMENT BE ENTERED ACCORDINGLY.