John P. **BAIRD**, et al., Plaintiffs,

v.

Stephen **KESSLER**, et al., Defendants.

No. CIV.S–00–1619WBS/PAN.

United States District Court,
E.D. California.

Nov. 7, 2001.

Joel Herbert Levinson, California Correctional Peace, Officers Association, Legal Department, West Sacramento, CA, for Plaintiffs.

Edmund K. Brehl, California Department of Personnel Administration, Legal Division, Sacramento, CA, for Defendants.

## MEMORANDUM AND ORDER

SHUBB, District Judge.

Plaintiffs and consenters (collectively "plaintiffs") sue defendants Stephen Kessler, et al. for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. section 201 *et seq.*[1] Plaintiffs and defendants each move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### I. *Factual and Procedural Background*[2]

#### A. *The Parties*

Plaintiffs in this case were all employed during the relevant time period as correctional officers in the Transportation Unit of the California Department of Corrections ("CDC"), transporting inmates and parolees between prisons, county jails, prison reception centers, community correctional facilities, and to legal and medical appointments.

Defendants are nine CDC managers, purportedly sued in their individual capacities for violations of the Fair Labor Standards Act ("FLSA"). Collectively defendants represent the chain of command from the Chief of Transportation, up to the Director of the CDC. In addition, plaintiffs have named the Deputy Director of the Administrative Services Division, not in the aforementioned chain of command, but responsible for maintaining employee records for the Transportation Unit.[3]

#### B. *State of California Payroll Practices and the 98–99 MOU*

Pursuant to the FLSA, state employee compensation is calculated within the framework of "work periods" and "pay periods." The FLSA defines "work period" as the recurring amount of time for which overtime is due after a certain number of hours worked. The term "pay period" refers to the regular period for which employers pay wages. "Work period" is a term of art distinct from and not necessarily coterminous with pay period. 29 C.F.R. §§ 553.224, 553.230, 553.233, 778.105.

---

1. 29 U.S.C. section 216(b) allows for employees to opt-in to an FLSA action by filing consent forms in the court in which the action is pending. *See* 29 U.S.C. § 216(b).

2. Facts discussed herein are drawn from the 43–page Joint Statement of Undisputed Facts filed by the parties concurrently with these motions.

3. The defendants are as follows:
   (1) Stephen Kessler, Deputy Director of the Administrative Services Division of the CDC; (2) Tom Goughnour, Chief of the CDC Transportation Unit until July 1999; (3) Steve Dizmon, Acting Chief of the Transportation Unit since approximately July 1999; (4) Ruth Melrose, Chief of the CDC Institution Operations; (5) Bill Dieball, Assistant Deputy Director of the CDC Institution Operations and Programs; (6) Edward S. Alameida, Jr., Acting Assistant Deputy Director, CDC Institution Operations and Programs, since approximately October 1999; (7) Dave Tristan, CDC Deputy Director, Institutions Division; (8) Steven Cambra, Jr., CDC Chief Deputy Director, Field Operations, and (9) Cal A. Terhune, Director of Corrections for the CDC.

In California, the salary for State employees, including those employed in the CDC, is calculated based on twelve pay periods in a calendar year, with each pay period approximating a single month. "Pay days" occur on the last day of each pay period. Historically, California considered one week to be a work period, and thus, each hour worked in excess of 40 hours in one week was considered overtime under the FLSA. Commensurate with this work period framework, the CDC calculated overtime compensation for each week in the pay period. The information was then gathered at the close of the pay period and overtime compensation checks were issued around the 15th of the month following the close of the pay period.

Then, in 1998, after a period of collective bargaining between the CDC and the California Correctional Peace Officers Association ("CCPOA"), the work period for plaintiffs was modified to a 28–day work period, as reflected in the 98–99 Memorandum of Understanding ("98–99 MOU"). Plaintiffs would now receive overtime compensation for any hour worked in excess of 168 hours in a 28–day work period. (Pls.' Ex. A, Attached to Pls.' Mot.) Such a work period is contemplated in section 207(k) of the FLSA, and is referred to as the "7(k) exemption." The 7(k) exemption allows certain correctional personnel to define their work period up to 28 days long, and the employer is not obligated to pay overtime for up to 171 hours worked in the work period.[4] 29 U.S.C. § 207(k).

Thus, the 98–99 MOU set a new work period for purposes of overtime calculations, the 28–day work period, but it did not alter the State's long-used system of collecting time sheets at the end of the pay

period. As a result, plaintiffs now have 13 work periods in a year, and the work periods no longer coincide with the pay periods. With the new system, as the calendar year progresses plaintiffs' work periods begin ending several days, even weeks, before the end of their pay periods.

The State, however, continues to collect plaintiffs' time sheets at the end of each pay period, issuing only 12 overtime checks annually, as it has been doing for 70 years under the old system of calculating overtime. Consequently, plaintiffs' overtime checks are issued farther and farther away from the work period in which the overtime was actually earned.

Difficulties in ensuring the timely payment of overtime checks, however, are not unique to the new 28–day work period system.[5] Even prior to the 28–day work period, the CDC realized that it was not always paying its employees their overtime compensation by the 15th of the month that followed the pay period in which the overtime was earned. As a result, the CDC and the CCPOA agreed that the following provision would appear in all future MOUs, including the 98–99 MOU:

11.06 Overtime Checks

Each institution shall make its best effort to process employees' overtime checks in the shortest possible time. Overtime checks shall be released to the employee as soon as possible following their receipt and expeditious processing at the institution/facility/camp office.

Upon notice from the CCPOA, the State agrees to meet at a job site where issuance of overtime checks is consistently beyond the 15th of the month for the purpose of developing a mutually

---

**4.** The 28–day work period is often referred to as the 7(k) work period.

**5.** The CDC's position is that if the overtime checks were late, it was because the system

for calculating overtime was not automated and because the Administrative Services Division was understaffed and there was a statewide hiring freeze.

acceptable check distribution process. Part of this process may include Express Service (mail, delivery service, or personal service) to the Controller's Office and, if possible, from the Controller's Office.

(Pls.' Ex. A, Attached to Pls.' Mot.).

Mindful of the administrative difficulties inherent in grafting the new 28–day work period onto the historical system of collecting time sheets at the end of the pay period, the CDC and the CCPOA also negotiated the inclusion of Sideletter # 7 into to the 98–99 MOU. It provides as follows:

> The parties agree that upon ratification through May 1, 1999, Section 11.06 shall be held in abeyance. Management agrees that during this period overtime checks shall be released as soon as possible, but no later than the 25th day of the month following the pay period in which the overtime was earned. Effective May 1, 1999, Section 11.06 shall be reinstated in its entirety and this sideletter shall expire.

(Pls.' Ex. A, Attached to Pls.' Mot.).

### C. *Plaintiffs' Complaint and Motion for Summary Judgment*

On November 14, 2001, plaintiffs filed their first amended complaint alleging that defendants, in their individual capacities, violated the FLSA by failing to timely pay plaintiffs their overtime compensation. In addition, plaintiffs allege that defendants, in their individual capacities, violated the FLSA by failing to timely pay plaintiffs' retroactive overtime pay increases.[6] Plaintiffs seek the following relief for each of the approximately 121 plaintiffs: (1) liquidated damages in an amount equal to 100% of each late overtime check; (2) liquidated damages equal to 100% of the total retroactive overtime pay increase; (3) pre

and post judgment interest; and (4) reasonable attorneys' fees and costs.

### II. *Discussion*

The court must grant summary judgment to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party adverse to a motion for summary judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Simply put, "a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). The non-moving party must show more than a mere "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. *The FLSA*

The FLSA was passed in 1938 and, in its original form, did not apply to states or their political subdivisions. The Act purported to be an "exercise by Congress of its power to regulate commerce among the several States ...." 29 U.S.C. § 202(b). The FLSA's purpose was to achieve "certain minimum labor standards." *Mitchell v. Robert De Mario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Included in those minimum labor standards was compensation for overtime work. *See Overnight Motor Transp. Co. v.*

---

**6.** The retroactive wage increase is reflected in the 99–01 MOU.

*Missel,* 316 U.S. 572, 577–78, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942).

In 1974, Congress broadened the coverage of the FLSA, allowing for an action to be maintained against a public agency, *see* 29 U.S.C. § 216(b), and defining "public agency" to include "the government of a State or political subdivision thereof" and "any agency of ... a State, or political subdivision of a State," 29 U.S.C. § 203(x). Thus, suits could thereafter be brought against states, their agencies, and political subdivisions, in federal court so long as the states had unambiguously waived their sovereign immunity. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

■ In accordance with *Seminole Tribe,* because California has not expressly waived its sovereign immunity under the FLSA, plaintiffs could not have brought this suit against the State. *See, e.g., Alden v. Maine,* 527 U.S. 706, 757, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Furthermore, plaintiffs could not have brought this suit against these defendants in their official capacity because such a suit would also be barred by the Eleventh Amendment. *Id.* Consequently, plaintiffs drafted their complaint to identify this as a suit against these defendants only in their individual capacity. In order for such a claim to survive, however, plaintiffs must first establish that these individual state officers are "employers," as that term is used in the FLSA. 29 U.S.C. § 203(d); *see Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1468 (9th Cir.1983) (finding that in order for the FLSA to apply, the defendant must be an "employer" within the meaning of the FLSA).

B. *Whether Defendants are Employers Under the FLSA*

■ Under the FLSA, " 'employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee ...." 29 U.S.C. § 203(d). The Ninth Circuit has interpreted this to be a definition of "employer" that is "not limited by the common law concept of [an] 'employer.' " *Id.* at 1469. Further, the term employer "is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Id.*

■ "The determination of whether an employer-employee relationship exists, [however,] does not depend on 'isolated factors but rather upon the circumstances of the whole activity.' " *Id.* (quoting *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)). Thus, the Supreme Court has stated that "the touchstone is 'economic reality.' " *Bonnette,* 704 F.2d at 1469 (quoting *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)). Additionally, it is possible for "two or more employers to jointly employ someone for purposes of the FLSA." *Bonnette,* 704 F.2d at 1469 (citing *Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973)). Under the FLSA, all such joint employers are individually responsible for compliance with the terms of the FLSA. *Bonnette,* 704 F.2d at 1469 (citing 29 C.F.R. § 791.2(a) (1981)).

■ In order to assist the district courts in divining the existence of an employer-employee relationship, the Ninth Circuit has established what it refers to as "a useful framework." *Bonnette,* 704 F.2d at 1470. Although, "not etched in stone," the Ninth Circuit has stated that the following factors should be considered in making such a determination: (1) whether the alleged employer had the power to hire and fire the employees; (2) whether the alleged employer supervised and controlled employee work schedules or conditions of employment; (3) whether the alleged em-

ployer determined the rate and method of payment; and (4) whether the alleged employer maintained employment records. *Id.*

■ In addition, this court agrees that: too much weight cannot be put on the Act's broadly inclusive definition of "employer." Taken literally and applied in this context it would make any supervisory employee, even those without any control over the corporation's payroll, personally liable for the unpaid or deficient wages or other employees. It makes more sense, ..., to interpret the language as intended to prevent employers from shielding themselves from responsibility for the acts of their agents. *Donovan v. Agnew,* 712 F.2d 1509, 1513 (1st Cir.1983). Applying the Ninth Circuit's framework with this in mind, plaintiffs have failed to establish that these defendants are employers under the FLSA.

■ It is undisputed that the most "powerful" of these defendants could make civil appointments, appoint employees to work in the Transportation Unit, and participate in the collective bargaining process with the CCPOA. It is also not in dispute that many of these defendants, as supervisors and managers, set plaintiffs' schedules, assisted in the drafting of employee handbooks, approved "post orders," recommended or reviewed the termination of other employees, and maintained employment records for the CDC.

Considering the economic reality of the circumstances here, a crucial aspect of control is missing. Despite their varying degrees of participation in the day-to-day work environment of these plaintiffs, none of these defendants "control the purse strings" that support plaintiffs' jobs. *See*

*Bonnette,* 704 F.2d at 1470 (finding that power over the employment relationship by virtue of control over the purse strings is a substantial factor in identifying an employee-employer relationship). In this instance, the State maintains all of the control.

An example of the absolute control that the State has over the salaries of its employees, including plaintiffs, can be found in *Biggs v. Wilson,* 1 F.3d 1537 (9th Cir. 1993). In *Biggs,* the plaintiffs, California highway maintenance workers, were suing then Governor of California, Pete Wilson.[7] The Ninth Circuit held that the state's failure to issue plaintiffs' pay checks on their regularly scheduled pay day, in that case July 16, 1990, was a violation of the FLSA.

The reason for the delay in the issuance of plaintiffs' checks was that "[i]n 1990, State law prohibited the release of paychecks until a budget was approved by the Legislature and signed by the Governor." *Id.* at 1538. Thus, until the state legislature passed a state budget on July 28, and it was signed by the Governor on July 31, not a single state employee received a pay check. *Id.* That a state-wide budget impasse in the legislature could prevent all state employees from receiving their paychecks indisputably demonstrates the "economic reality" of being a state employee: the State, not your supervisors or managers, is your employer, and it is the State that determines when, or even if you will receive a paycheck.

Another example of the State's control over the working environment of all state employees can be found in the current action. Here, the parties have submitted as an "undisputed fact" that when defendant Kessler wanted additional personnel

---

**7.** *Biggs v. Wilson,* was decided prior to *Seminole Tribe,* 517 U.S. 44, 116 S.Ct. 1114, and *Alden,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636. Accordingly, at that time the State and its officials, in their official capacity, were proper defendants in an FLSA action.

to assist the Administrative Office in the manual calculation of overtime for the Transportation Unit, the State refused his request. Kessler was informed that the State was experiencing a $50 million budget deficit requiring a state-wide hiring freeze. Thus, unless Kessler could prove a 20% vacancy rate in the entire accounting office, including eight regional offices, he would not be allowed to hire any more employees.

The hiring freeze instituted by the State clearly had a dramatic effect on the work environment of CDC employees, and apparently none of these defendants could temper that effect. For example, as a result of the state-wide hiring freeze, the workload at the Administrative Service Division became "unacceptable," and employee morale was low. As a result, the Administrative Service Division had a 20–25% vacancy rate, which defendant Kessler, even as the director, could not fill. *See Donovan*, 712 F.2d at 1514 (finding that corporate officers with significant ownership interest who personally made decisions to continue operations despite financial adversity were employers under the FLSA).

In light of these circumstances, defendants cannot be considered employers for the purposes of the FLSA. *See Bonnette*, 704 F.2d at 1469 (reiterating that the determination of an employee-employer relationship does not depend on "isolated factors but rather upon the circumstances of the whole activity"). Congress could not have intended to hold individuals personally liable for alleged violations of the FLSA when those individuals cannot even control crucial aspects of the work environment such as when and if paychecks will issue, how many employees are necessary, and whether or not more employees can be hired.

Moreover, in the present action, by suing the defendants in their individual capacity plaintiffs have attempted to effectively sever these "managerial" defendants from the corporation, i.e. the State. Unlike an action against a private corporation, however, the court cannot find these defendants jointly and severally liable with the State, not only because the State is not a party to the action, but because the State *could* not be a party to the action under the Eleventh Amendment. *See Donovan*, 712 F.2d at 1511 (finding that officers of corporations found to be liable under the FLSA are jointly and severally liable with the corporation). Consequently, if the court were to find in favor of plaintiffs in this action, without the State as a party, the court likely could not give the FLSA its intended remedial effect because these individual defendants, without the funds of the State, are unlikely to be able to provide the relief plaintiffs are seeking.

This court does not believe that Congress intended to make each individual manager and officer within a business, public or private, personally liable for violations of the FLSA, when a manager or officer cannot control the very things which may lead to violations of the FLSA. Such a rule would discourage rather than encourage men and women from working hard, in an effort to "move up" the ranks toward "better" jobs. Accordingly, the court finds that these defendants are not employers under the FLSA, and thus cannot be held personally liable for any violations of the FLSA. As discussed below, the reality of this suit is that plaintiffs are attempting make an end run around the Eleventh Amendment by lining up the chain of command in the CDC, purport to sue them in their individual capacities, and say that "someone ... should shoulder the responsibility." (Pls.' Reply Brf. at 12:9–10).

## C. *Eleventh Amendment Immunity*

Plaintiffs here have attempted to circumvent sovereign immunity by suing

these state officers in their individual capacity. *Alden,* 527 U.S. at 757, 119 S.Ct. 2240; (*see* discussion *supra* § III. A). Thus, even if the court were to find that these defendants were employers under the FLSA, the court would still be obliged to consider whether the action, is "really and substantially" an action against the state. *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 270, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Greater Los Angeles Council on Deafness, Inc. v. Zolin,* 812 F.2d 1103, 1110 (9th Cir.1987).

▬ This court agrees with the Fourth Circuit's determination, that "if a statute treats an individual state employee as the employer, the real party in interest is in reality the state itself." *Montgomery v. Maryland,* 266 F.3d 334 (4th Cir.2001) (citing *Luder v. Endicott,* 253 F.3d 1020, 1022–23 (7th Cir.2001)); *see Lopez Rosario v. The Police Department,* 126 F.Supp.2d 167, 171 (D.Puerto Rico 2000) (citing *Hale v. State of Arizona,* 993 F.2d 1387, 1399 (9th Cir.1993)) (finding that "the conduct complained of 'is not personal, and money damages for wages due would be paid out of the state treasury ....'"). Accordingly, even if this court were to find that these defendants were employers under the FLSA, the matter would be dismissed on the ground of sovereign immunity because the state is the real party in interest.

### D. *Waiver of Immunity As An Affirmative Defense*

▬ Plaintiffs argue that defendants have waived their right to raise the Eleventh Amendment as an affirmative defense to this action. The Eleventh Amendment " 'does not implicate a federal court's subject matter jurisdiction in any ordinary sense' and 'may even be forfeited by the State's failure to assert it.'" *Hill d/b/a/ American Sewing & Bag Co. v. Blind Industries and Services of Maryland,* 179 F.3d 754, 760 (9th Cir.1999) (quoting *ITSI TV Prods. Inc. v. Agricultural Ass'ns,* 3 F.3d 1289 (9th Cir.1993)). Specifically, a state may waive its sovereign immunity by its conduct during litigation. *Hill,* 179 F.3d at 759 (finding that waiting until the day before trial, after a jury has been selected is a waiver of sovereign immunity).

▬ Further, sovereign immunity cannot be used to gain an improper tactical advantage or as an "offensive shield." *Watkins v. California Dep't of Corrections,* 100 F.Supp.2d 1227, 1230–231 (C.D.Cal. 2000). Thus, the state cannot assert the defense of Eleventh Amendment immunity after it has already litigated the merits of an action. *See Hill,* 179 F.3d at 756–57 (finding that "the integrity of the judicial process is undermined if a party, unhappy with the trial court's ruling or anticipating defeat, can unilaterally void the entire proceeding ..."); *see also Spingola v. Regents of University of California,* 2000 WL 1780260 (N.D.Cal.2000) (finding that the state's conduct did not "demonstrate an unambiguous intent to waive immunity because the state has not previously litigated the merits of its case before the summary judgment motion").

▬ Here, defendants asserted Eleventh Amendment immunity as an affirmative defense in their answer. Because it was not obvious from the face of the complaint whether they were effectively being sued in their official or individual capacity, it was not until after close of discovery that defendants felt they could support a defense of sovereign immunity.[8] Thus, de-

---

8. Presumably this is also why defendants did not file a motion challenging jurisdiction after this court's status order instructing them to file all such motions within 30 days. Whatev-

er drove defendants' decision to disregard the court's November 3, 2000, status order, that choice was not made with the unambiguous intent of permanently waiving the defense.

fendants have not unambiguously waived their right to assert the defense of sovereign immunity under the Eleventh Amendment.

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment that defendants violated the FLSA be, and the same hereby is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment be, and the same hereby is GRANTED.